**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
|      **Plaintiff,** | ) |
| | ) |
|      **v.** | ) **No. 4:20-CR-00707-AGF-SRW** |
| | ) |
| | ) |
| **MATTHEW THILGES,** | ) |
| | ) |
|      **Defendant.** | ) |

**EVIDENTIARY HEARING**

**BEFORE THE HONORABLE STEPHEN R. WELBY**
**UNITED STATES MAGISTRATE JUDGE**

**JANUARY 26, 2023**

APPEARANCES:

For Plaintiff: Colleen C. Lang, Esq.
              OFFICE OF THE U.S. ATTORNEY
              111 South 10th Street, 20th Floor
              St. Louis, MO 63102

For Defendant: Kenneth Schwartz, Esq.
               KENNETH R. SCHWARTZ LAW OFFICES
               7751 Carondelet, Suite 204
               Clayton, MO 63105




Reported By:  CARLA M. KLAUSTERMEIER, RMR, CRR, CSR, CCR
              Official Court Reporter
              United States District Court
              111 South 10th Street
              St. Louis, MO 63102 | (314)244-7984


    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

*Evidentiary Hearing*                                                    2

1                              INDEX

2    WITNESSES:                                              Page

3    KYLE STORM
          Direct Examination By Ms. Lang                      6
4         Cross-Examination By Mr. Schwartz                  36
          Redirect Examination By Ms. Lang                   76
5         Recross Examination By Mr. Schwartz                82

6    GREGORY MARX
          Direct Examination By Ms. Lang                     84
7         Cross-Examination By Mr. Schwartz                  87
          Redirect Examination By Ms. Lang                  114
8         Recross Examination By Mr. Schwartz               116

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              **(The proceedings commenced at 9:30 a.m.)**

 2              **(The following proceedings were held in open court**

 3      **with the defendant present:)**

 4              **THE COURT:**  Good morning.  We're here in the case of

 5      United States of America v. Matthew Thilges.  The Cause Number

 6      is 4:20-CR-707.  The case is assigned to Judge Fleissig for

 7      trial, and to me, Steve Welby, for pretrial matters.

 8              Would counsel please introduce themselves.

 9              **MS. LANG:**  Colleen Lang for the Government.

10              **THE COURT:**  Good morning.

11              **MR. SCHWARTZ:**  Ken Schwartz, Your Honor, with

12      Mr. Thilges.

13              **THE COURT:**  All right.  Good morning to both of you.

14              **MR. SCHWARTZ:**  And I'm sorry.  This is Edward

15      Worman.  Ed is a new member of the mentee panel of the CJA

16      panel and I'm his mentor.

17              **THE COURT:**  All right.  Mr. Worman, welcome to you.

18              **MR. WORMAN:**  Thank you, Judge.

19              **THE COURT:**  All right.  We are here because the

20      defense -- defendant has filed two motions.  One is a motion

21      to dismiss Count 3 of the indictment.  That's Docket No. 94.

22      The other is the defendant's amended motion to suppress

23      evidence and statements due to invalid search warrants.

24      That's Docket No. 95.  The Government has responded to both of

25      those motions.

1          So, Mr. Schwartz, I would note that your motion

2    concerning the suppression has some allegations concerning

3    violations of *Franks* -- *Franks* violations.  I have not granted

4    a *Franks* hearing, but I am willing to hear arguments today as

5    to why you think a *Franks* hearing should be granted or for you

6    to -- allow you to present any evidence in addition to what

7    you have in your motions as to what additional information you

8    think would change the nature of the search warrant to allow

9    that to take place.

10         **MR. SCHWARTZ:**  I understand, Your Honor.  I'm fine

11   with that or I -- I don't think I would have alleged any

12   additional information.  I don't know what the Government's

13   position is.  But I think I would be fine with the -- with the

14   Court making that determination, the whole thing based on this

15   record.  But if the Government has additional stuff, then I

16   would just ask that you consider a hearing and then we could

17   move forward if that's the decision you'd make.

18         **THE COURT:**  Yeah.  I'm certainly interested in your

19   arguments on probable cause.  But I just wanted to make it

20   clear that I hadn't authorized a *Franks* hearing to come up and

21   attack the agent for lying in the affidavit or things of that

22   nature.  But if you have arguments with respect to probable

23   cause on what is in the affidavit, you could certainly ask

24   questions about that.  Or if you had additional evidence and

25   you said, In addition to what I have in my pleadings, here's

1    what was left out of the search warrant that I think would

2    change the -- would have changed Judge Bodenhausen's mind when

3    he granted the motion -- or granted the search warrant.

4            **MR. SCHWARTZ:**   And I think, honestly, I will have

5    some -- I will try to elicit some evidence along those lines

6    that goes towards the search warrant validity itself, but also

7    would sort of spill over into a *Franks* type analysis as well,

8    and if you'd like, I'll make it clear what I'm doing when I

9    ask those questions if you want me to.

10           **THE COURT:**   Yeah.  I think if you go too far,

11   Ms. Lang may have an objection.  So we'll --

12           **MR. SCHWARTZ:**   I understand.

13           **THE COURT:**   -- we'll take it as it comes.  But I

14   just wanted to, sort of, tell you my perspective on this.

15           **MR. SCHWARTZ:**   I understand.   Thank you.

16           **THE COURT:**   So, Mr. Schwartz, these are your

17   motions.  Do you know how the parties want to present the

18   evidence today?

19           **MR. SCHWARTZ:**   Do I know how -- I would assume since

20   the burden -- I would assume the Government would want to

21   proceed first, although if they don't want to, I'm fine.

22           **MS. LANG:**   Your Honor, I'm prepared to proceed.   I

23   have two witnesses to call today.

24           **THE COURT:**   Okay.  If you're all right with that,

25   Mr. Schwartz, then we'll let the Government go first.

*Evidentiary Hearing*                                                                 6

| | |
|---|---|
| 1 | **MR. SCHWARTZ:**  Thank you. |
| 2 | **THE COURT:**  All right.  Ms. Lang? |
| 3 | **MS. LANG:**  Thank you, Your Honor.  Is it all right |
| 4 | if I go ahead and call my first witness? |
| 5 | **THE COURT:**  Yes. |
| 6 | **MS. LANG:**  All right.  At this time, the Government |
| 7 | calls Kyle Storm to the stand. |
| 8 | **(Witness sworn.)** |
| 9 | **THE COURT:**  You may proceed. |
| 10 | **MS. LANG:**  Thank you, Your Honor. |
| 11 | **KYLE STORM,** |
| 12 | **Having Been First Duly Sworn, Was Examined and Testified As** |
| 13 | **Follows:** |
| 14 | **DIRECT EXAMINATION** |
| 15 | **BY MS. LANG:** |
| 16 | Q.   Please state your name. |
| 17 | A.   Kyle Storm. |
| 18 | Q.   And what is your occupation? |
| 19 | A.   Special agent with a FBI. |
| 20 | Q.   And how long have you been a special agent with the FBI? |
| 21 | A.   Since 2016. |
| 22 | Q.   And where are you currently assigned? |
| 23 | A.   I'm currently assigned to the FBI Honolulu division. |
| 24 | Q.   And how long have you been with the Honolulu division? |
| 25 | A.   Since January. |

1    Q.    And before that, what field office were you assigned to

2    for the FBI?

3    A.    St. Louis.

4    Q.    And with were you with St. Louis since 2016 then?

5    A.    Correct.

6    Q.    Up until recently?

7              Now, when you were with the St. Louis office, did

8    you participate in an investigation into Matthew Thilges?

9    A.    I did.

10   Q.    And when, approximately, did that investigation start?

11   A.    In the summer of 2019.

12   Q.    And how did that investigation begin at the FBI?

13   A.    It began with a complaint from Google.

14   Q.    And what's Google?

15   A.    Google is a large company that has various platforms and

16   e-mail addresses and things of that nature.

17   Q.    And you said they sent a complaint to the FBI.  And just,

18   generally, what was their complaint?

19   A.    Their complaint was that a user on the YouTube platform

20   was making threats online.

21   Q.    And is YouTube -- is Google the parent company for

22   YouTube?

23   A.    Yes, it is.

24   Q.    And how did you receive Google's complaint that there

25   were threats being posted on YouTube?

1    A.    It was through our Fusion Centers.  I believe they

2    contacted the Fusion Center in California and then they

3    forwarded the information to the St. Louis Fusion Center.

4    Q.    And why was it forwarded to the St. Louis Fusion Center

5    if Google's in California?

6    A.    Because the IP address that they believed the user was

7    coming from was coming from an IP address likely located in

8    the St. Louis region.

9    Q.    And so Google actually found -- that company or employees

10   at that company actually found the threats online and then

11   sent them to the FBI; correct?

12   A.    Correct.

13   Q.    And what was the reason that Google decided to report

14   this?

15              **MR. SCHWARTZ:**  Objection.  Calls for speculation.

16              **THE COURT:**  I'll allow it.  I'm going to overrule

17   the objection.

18   A.    There were threats to kill Google employees.

19   **Q.    (By Ms. Lang)** And was there anything that had recently

20   happened at Google that would've made them more heightened of

21   these type of threats?

22              **MR. SCHWARTZ:**  Objection.  Calls for speculation.

23              **THE COURT:**  I think we're just seeking background

24   information.  Is that correct, Ms. Lang?

25              **MS. LANG:**  That's correct.

1          **MR. SCHWARTZ:**  I'll withdraw the objection.

2          **THE COURT:**  I'll overrule it on that basis.

3   A.   In 2018, they had a shooting on the YouTube campus.

4   **Q.   (By Ms. Lang)** During the course of your investigation,

5   did you talk to employees and representatives from Google and

6   YouTube?

7   A.   I did.

8   Q.   And then did you begin to investigate where the threats

9   to Google that were originating on the YouTube platform, were

10  you trying -- did you try and figure out where those came

11  from?

12  A.   Yes.

13  Q.   And how did you do that?

14  A.   Through a legal process to obtain subscriber records for

15  the IP address of where they were logging in from.

16  Q.   And were you able to track it back to an individual?

17  A.   Yes.

18  Q.   And who was that?

19  A.   Matthew Thilges.

20  Q.   And is he here in the courtroom today?

21  A.   He is.

22  Q.   And where is he in the courtroom and what is he wearing?

23  A.   He's at the defendant's table in orange.

24          **MS. LANG:**  Your Honor, may the record reflect that

25  the witness has identified the defendant?

1       **THE COURT:**  The record will so reflect.

2    **Q.    (By Ms. Lang)** Now, in November of 2019, did you draft a

3    search warrant in this case?

4    A.    I did.

5    Q.    And was it for an e-mail account?

6    A.    It was.

7    Q.    And what was the purpose of that?

8    A.    To obtain information to identify who was using the

9    account.

10   Q.    And did that -- and what e-mail provider did that search

11   warrant go to?

12   A.    Google.

13   Q.    And did they provide you with information that assisted

14   you in your investigation?

15   A.    Yes, they did.

16   Q.    And what kind of information did they -- did you receive

17   from Google when you submitted that e-mail address that was

18   related to threats?

19   A.    Log-in information and also accounts that was used to

20   create, whether it was other social media platforms.

21   Q.    Now, once -- and you said earlier that you identified the

22   defendant through IP addresses that were used in the posting

23   of the threat.  In the threats or via the e-mail addresses?

24   A.    Both.  So the -- when the threats are posted online,

25   they're used through an account and the account was used and

1    registered through an e-mail address.

2    Q.    And then that e-mail address -- the IP address that that

3    e-mail address used came back to the defendant; correct?

4    A.    Yes, it did.

5    Q.    Now, throughout the course of your investigation, how

6    many e-mail accounts were you able to attribute to the

7    defendant that he used to post threats?

8    A.    We identified three that he used to post the threats.

9    Q.    And going back one question.  I apologize.  The

10   IP addresses, did those come back to the defendant's home or

11   work or something else?

12   A.    Yes.  They were registered through Charter/Spectrum

13   services that came back to his residence.

14   Q.    And then you said that you were able to attribute three

15   different e-mail addresses to the defendant.  Do you remember

16   what those three e-mail addresses are?

17   A.    Yes.  They were fguuglecocksuckers@gmail,

18   guggleisfascistpig@gmail, and jackisaterrorist@protonmail.

19   Q.    And during the course of your investigation, did you come

20   across that the defendant had used those e-mail addresses to

21   create accounts on YouTube?

22   A.    Yes, he did.

23   Q.    And did -- at any point in time, did Google, YouTube or

24   another social media company attempt to suspend or block him

25   from posting because of the threats?

1   A.    Yes, they did.

2   Q.    And do you remember how many times?

3   A.    They suspended, I believe, two of the accounts from

4   Google, and then other Twitter accounts.

5   Q.    And after, you said, two of the e-mail addresses were

6   suspended from posting on those social media platforms, did

7   the -- based on your investigation, did the defendant attempt

8   to keep posting threats even after being suspended?

9   A.    Yes.

10  Q.    And what e-mail address did he create to continue to post

11  on the platforms?

12  A.    Jackisaterrorist@protonmail.

13  Q.    And moving to YouTube indirectly, how were the threats

14  posted on the YouTube platform?

15  A.    They were mainly left as comments on videos on YouTube.

16  Q.    And in total, throughout the course of your

17  investigation, how many threats were you able to attribute to

18  the defendant?

19  A.    Approximately 50.

20  Q.    And you said they were posted on -- as comments to videos

21  on YouTube.  Were they available to the public or was this a

22  private space?

23  A.    No.  It was available to the public.

24  Q.    Through the course of your investigation, did you ever

25  have the opportunity to do any surveillance on the home of the

1  defendant?

2  A.   We did.

3  Q.   And approximately when was that?

4  A.   January of 2020.

5  Q.   And then when did -- I might have asked this already, but

6  I'm going to go back.  When did the threats start appearing on

7  Google's platforms?

8  A.   Approximately 2018.

9  Q.   And then January of 2020, you said you did surveillance

10  on the home.  Were the threats still appearing on the

11  platforms at that point?

12  A.   They were.

13  Q.   Now, I'm going to move forward to the summer of 2020,

14  June and July.  What were, sort of, the -- were the threats

15  still being posted?

16  A.   Yes, they were.

17  Q.   And was there anything -- did you notice anything

18  different about the threats at that point?

19  A.   Yes.  We believed that they were becoming more aggressive

20  and violent in nature.

21  Q.   And then moving to about -- what about October of 2020?

22  A.   They continued to get more violent.

23  Q.   And you had already testified that some of the threats

24  were against YouTube employees and Google employees.  Now that

25  we're in June, July, and the fall of 2020, who were the

1    threats aimed towards at that point?

2    A.   Still Google employees, government employees, democrats,

3    and then also law enforcement.

4    Q.   At some point in October of 2020, did you draft a search

5    warrant for the defendant's home?

6    A.   I did.

7            **MS. LANG:**  Your Honor, may I approach?

8            **THE COURT:**  You may.

9            **MS. LANG:**  I'm just going to hand him the whole

10   packet.

11   **Q.   (By Ms. Lang)** Agent Storm, I just handed you a packet of

12   exhibits.  Could you take a look at Government's Exhibit 1?

13   A.   Yes.

14   Q.   And what is that?

15   A.   It's a search warrant for the residence of the defendant.

16   Q.   And who drafted that search warrant?

17   A.   I did.

18   Q.   What was the search warrant for?

19   A.   It was for evidence of threats made online and weapons.

20   Q.   And it was for the defendant's home; correct?

21   A.   Correct.

22   Q.   That Shawn Drive address is where Matthew Thilges lived

23   at the time?

24   A.   Correct.

25   Q.   Now, in the search warrant, did you include all of the

1  threats that, at that point, you had attributed to the

2  defendant or just some of them?

3  A.    Just some of them.

4  Q.    And why was that?

5  A.    Because we thought at the time the more recent ones were

6  more violent in nature.

7  Q.    And so I'm going to direct your attention to the

8  application for search warrant.  Did you draft that document?

9  A.    Yes.

10 Q.    And if you go to pages 9 and 10 of the probable cause

11 statement, which is paragraph 25 in your probable cause

12 statement, did you draft that?

13 A.    Yes.

14 Q.    And there is some alphabet numbering.  So A through P.

15 What are those that are listed there on those three pages?

16 A.    Those were threats that were posted by the defendant.

17 Q.    Okay.  And then it says, like, on A, on page -- in

18 paragraph 25 of the search warrant of Exhibit 1, it says

19 July 8th of 2020.  Is that the date it was posted?

20 A.    Yes.

21 Q.    And what does that first one read, A?

22 A.    "I do need violence.  I need to kill

23 alphabet/google/youtube employees now."

24 Q.    And then if you could go down to one that was posted on

25 July 13th of 2020, which is C.  Could you read that one into

1   the record?

2   A.   "Fuck the government, kill all democrats.  Start at

3   alphabet/google/youtube.  Kill them all."

4   Q.   And, D, could you also read that one?

5   A.   "Make the world a better place, shoot a democrat in the

6   face.  I have dibs on every alphabet/google/youtube employee.

7   You guys can start wherever you want."

8   Q.   And then I'm going to have you move forward to October,

9   it's on the next page, which is letter J.  What -- what did he

10  post on October 1st of 2020 that's written in the search

11  warrant?

12  A.   "If a cop, any cop, shows up at your door without a

13  warrant and attempted kidnap you or any member of your family,

14  you are not only entitled to shoot it in the face, you are

15  obligated to do so as an American citizen."

16  Q.   So as you'd stated earlier, the threats -- the nature of

17  the threats were becoming more violent as time progressed?

18  A.   Correct.

19  Q.   And the search warrant, Exhibit 1, did you present it to

20  a federal judge?

21  A.   I did.

22  Q.   And during the swearing out of that search warrant, was

23  there anything that you supplemented, any information you

24  supplemented to the Court that's not in the search warrant

25  affidavit itself?

1    A.    No.

2    Q.    All right.  And then that warrant was signed by the

3    Court.  Do you remember what day you executed that warrant?

4    A.    I executed it on the 21st.

5    Q.    And that was at the defendant's home on Shawn Drive?

6    A.    Correct.

7    Q.    And approximately what time of day did you -- did you and

8    the other FBI agents execute the warrant?

9    A.    At approximately 6:00 a.m.

10   Q.    And who was home during the execution of the search

11   warrant?

12   A.    The defendant, Matthew Thilges.

13           **MS. LANG:**  Your Honor, can I move to admit Exhibit 1

14   which is the search warrant for the Shawn Drive home along

15   with the attached application?

16           **THE COURT:**  Any objection, Mr. Schwartz?

17           **MR. SCHWARTZ:**  No objection.  And for the record,

18   these are official court documents, so I -- I think the Court

19   can take judicial notice of them anyway.  So, yeah, no

20   objection on those.

21           **THE COURT:**  All right.  I'll accept Exhibit 1 into

22   evidence.

23   **Q.    (By Ms. Lang)** Did the FBI perform a search of the

24   defendant's home on that day?

25   A.    We did.

1   Q.   And what was located -- were there any weapons located in

2   the home?

3   A.   Yes, there were.

4   Q.   And approximately how many weapons?

5   A.   Approximately eight assault rifles and two handguns.

6   Q.   Was a silencer located in the home?

7   A.   We found what appeared to be two silencers.

8   Q.   And was any ammunition located in the home?

9   A.   Yes.  There were thousands of rounds.

10  Q.   Did you locate any electronic or computer devices in the

11  home?

12  A.   Yes.  We found two computers and two cell phones.

13  Q.   And were those seized?

14  A.   They were.

15  Q.   Were those forensically examined?

16  A.   They were.

17  Q.   And who did that examination?

18  A.   Myself and two other agents on the Crimes Against

19  Children.

20  Q.   Do you have any training or experience to forensically

21  examine a computer and a cell phone?

22  A.   I do.

23  Q.   And just briefly, what type of experience do you have in

24  that area?

25  A.   I'm certified as a DEXT person for the FBI which is a

1    digital extraction technician.

2    Q.    Does that mean that you've had additional training on how

3    to extract data from computer and electronic devices?

4    A.    Yes.

5    Q.    And what software did you -- and did you analyze a

6    Samsung cell phone that was seized from defendant's home?

7    A.    I did.

8    Q.    And what type of software did you use to analyze that

9    Samsung cell phone?

10   A.    Cellebrite.

11   Q.    And are you trained on Cellebrite?

12   A.    Yes.

13   Q.    Now, did you -- were you able to get an extraction using

14   that software from the Samsung cell phone?

15   A.    Yes.

16   Q.    And did you come across any images that you -- that made

17   you worried?

18   A.    Yes.

19   Q.    And what types of images were those?

20   A.    Appeared to be, potentially, child pornography.

21   Q.    Okay.

22         **MR. SCHWARTZ:**  I'm sorry.  I didn't -- I didn't hear

23   the answer.  Appeared to be --

24         **MS. LANG:**  He said, potentially child pornography.

25         **THE WITNESS:**  Child pornography.

1           **MR. SCHWARTZ:**  I'm sorry.

2           **MS. LANG:**  Your Honor, may I approach?

3           **THE COURT:**  You may.

4  **Q.    (By Ms. Lang)** Agent Storm, I've just handed you what's

5  been marked as Exhibits 6a through 6e.  Could you take a look

6  at those?

7  A.    Yes.

8  Q.    And were those the images that you came across on the

9  cell phone?

10  A.    Yes, they were.

11  Q.    And could you, just generally, briefly describe those

12  images in 6a, 6- -- well, just start with 6a.

13  A.    Yeah.  It appears to be a minor female laying on a couch,

14  appearing to be asleep, with her pants pulls down.

15  Q.    And what about 6b?

16  A.    Also a young female minor with her pants pulled down,

17  sleeping on a couch.

18  Q.    And then the couch in the picture, did that mean anything

19  to you?

20  A.    Yes.  We saw that couch inside of the residence in the

21  search warrant.

22  Q.    So that was inside Mr. Thilges' residence, was that couch

23  with the girl that's now in the picture?

24  A.    Correct.

25           **MR. SCHWARTZ:**  Your Honor, could I just interrupt?

1   Could you put them on the ELMO so I could see them while he's

2   testifying?

3            **MS. LANG:**  No.  But I can hand them right back to

4   you.

5            **MR. SCHWARTZ:**  Okay.  Thank you.

6            **MS. LANG:**  So that was -- Your Honor, may I

7   approach?

8            **THE COURT:**  Why don't we identify them all and then

9   you can --

10           **MS. LANG:**  Okay.

11           **THE COURT:**  Does that make sense?

12           **MS. LANG:**  Yeah.

13           **THE COURT:**  Otherwise we're going to have to do it

14  one picture at a time.  Is that all right, Mr. Schwartz?

15           **MR. SCHWARTZ:**  Sure.  I just -- obviously, I don't

16  have those in my discovery.

17           **THE COURT:**  I understand.

18           **MR. SCHWARTZ:**  I've seen them at the U.S. Attorney's

19  Office, but, you know, I don't necessarily remember every

20  single one of them.

21           **THE COURT:**  Okay.  If we could just quickly identify

22  them and then --

23           **MS. LANG:**  Sure.

24  Q.   **(By Ms. Lang)** Could you briefly describe 6c?

25  A.   It was a young female minor asleep on a couch with her

| | |
|---|---|
| 1 | pants pulled down. |
| 2 | Q.   And 6d? |
| 3 | A.   It appeared to be a young female minor in a bathtub, |
| 4 | appearing to be naked. |
| 5 | Q.   And then 6e? |
| 6 | A.   It was a young female holding an assault rifle with the |
| 7 | words, "Make the world a better place, shoot a liberal in the |
| 8 | face." |
| 9 | Q.   Thank you. |
| 10 | **THE COURT:**  And just for the record, the exhibits |
| 11 | were given to Mr. Schwartz; is that correct? |
| 12 | **MS. LANG:**  That's correct, Your Honor. |
| 13 | **THE COURT:**  All right.  You may proceed. |
| 14 | **MS. LANG:**   Thank you. |
| 15 | **Q.   (By Ms. Lang)** And based on your forensic training, were |
| 16 | you able to determine when you came across those images that |
| 17 | we -- you just described, 6a through 6c, what device or how |
| 18 | they had been taken? |
| 19 | A.   It appeared they had been taken with a cell phone. |
| 20 | Q.   Were there any other pictures of children in his home on |
| 21 | the cell phone? |
| 22 | A.   There were. |
| 23 | Q.   And what types of pictures were there? |
| 24 | A.   They were benign pictures. |
| 25 | Q.   Okay.  Were the children sleeping in the pictures? |

1   A.    They were.

2   Q.    Now, after you came across the images that we just

3   described in 6a through 6e, what did you do?

4   A.    I believe that it was likely child pornography, so I

5   called another special agent from the Crimes Against Children

6   squad.

7   Q.    And who was that?

8   A.    Greg Marx.

9   Q.    And then did Greg Marx get a second subsequent search

10  warrant for child pornography for the computer devices?

11  A.    Yes.

12  Q.    Now, going -- you said that there were weapons located in

13  the home; correct?

14  A.    Correct.

15  Q.    In the packet that I left on your -- that I handed you

16  earlier, could you now take a look at Government's 3, 4, and

17  5?

18  A.    Yes.

19  Q.    And on Government's Exhibit 3, what are -- what are we

20  looking at here?  It's a two-page exhibit.

21  A.    It is a screenshot of a YouTube video where a comment has

22  been left by guugle/screwtube FASCISM.

23  Q.    And you attributed, through your investigation, that

24  guugle/screwtube FASCISM was the defendant's account on

25  YouTube; correct?

1   A.    Correct.

2   Q.    All right.  And then did he -- and it's on the second

3   page of Exhibit 3.  It's more clear, but did he post a threat

4   that day to that video?

5   A.    It showed he had means.  He mentioned that he had two

6   fully-loaded semi-automatic weapons in the vehicle at all

7   times.  He never had to use them, but he was always prepared

8   to do so.

9   Q.    And then he listed St. Louis County; correct?

10  A.    Yes.

11  Q.    Actually, let me go back one step.  On Exhibits 3, 4, and

12  5, do you recognize all of those exhibits?

13  A.    I do.

14  Q.    And are all of those screenshots that you took from

15  YouTube?

16  A.    It is.

17  Q.    And the threats that are highlighted on those, were they

18  all attributed back to the defendant through IP addresses?

19  A.    Yes.

20  Q.    So going back --

21          **MS. LANG:**  Your Honor, at this time, I'd like to

22  admit 3, 4, and 5.

23          **THE COURT:**  Any objection to 3, 4, and 5?

24          **MR. SCHWARTZ:**  No, Your Honor.  No objection.

25          **THE COURT:**  All right.  3, 4, and 5 will be

1   admitted.  Where are we on 6?  Have you -- are you waiting to

2   introduce --

3           **MS. LANG:**  Oh.  I guess I'm going to ask for 6a

4   through 6e to be admitted unless Mr. Schwartz has any

5   objections at this time.

6           **THE COURT:**  Any objection to the photographs?

7           **MR. SCHWARTZ:**  So I'm sorry.  You're not moving for

8   admission of 6a through e?

9           **MS. LANG:**  I am moving for admission.  Now that

10  you've had a chance to look at them, do you have any

11  objections?

12          **MR. SCHWARTZ:**  No objection.  No.

13          **THE COURT:**  All right.  6a through e will be

14  admitted and Exhibits 1, 3, 4, and 5 are admitted.

15          **MS. LANG:**  Thank you.

16          **MR. SCHWARTZ:**  Just if I could.  I'm sorry.  Let me

17  just make one objection as to 3, 4, and 5, and it'll be a

18  hearsay and a *Crawford* objection.  I understand that some of

19  these comments are being attributed to Mr. Thilges.  But

20  there's, obviously, a lot of comments in here and the content

21  of whatever the video is that's the focal point, my objection

22  would be hearsay as well as -- as well as a *Crawford*

23  confrontation argument, Your Honor.

24          **THE COURT:**  Are you objecting to the statements that

25  are not attributed to the defendant?

1      **MR. SCHWARTZ:**  I would object to -- I would object

2    to the entire exhibit.  I understand, though, that as to the

3    statements that they're going to attribute to Mr. Thilges,

4    you know, obviously, they're making the claim that they're

5    attributed to him.  That may be an issue at trial.  But for

6    this purpose, I think that -- I think that those are

7    legitimate, as far as the Government's concerned, party

8    opponent statements.  But in terms of the -- all of the other

9    contents on the document, I do object.

10           And I could say that these are all two-page exhibits

11   with the alleged comment being the second page.  So if the

12   Court were to allow me to object to the first page of

13   Exhibit 3, 4, and 5, I would not object to the second page of

14   3, 4, and 5 as the Government alleges they're party opponent

15   statements.

16           **THE COURT:**  Ms. Lang, any response?

17           **MS. LANG:**  Your Honor, 3, 4, and 5, I'm just trying

18   to give the Court some context of how these looked to YouTube

19   and Google employees and the FBI at the time they were posted.

20   I'm not -- the other comments and the actual videos are not

21   relevant and I'm not asking, you know, that they play any part

22   in the hearing.  I could even redact them if it was necessary.

23           **THE COURT:**  No.  I think it is helpful to understand

24   the statements in the context in which they're made.  So I'm

25   going to overrule the defendant's objection on those exhibits

 1  and admit them fully into evidence.

 2              **MS. LANG:**  Thank you.

 3              **THE COURT:**  For the purposes of this hearing.

 4  **Q.    (By Ms. Lang)** Agent Storm, I've just put on the -- sort

 5  of the highlighted quote attributed to the defendant that's

 6  part of Government's Exhibit 3.  And you've already kind of

 7  read from it.  But this one, is there anything about him

 8  having weapons?

 9  A.    Yes.  Two fully-loaded semi-automatic.

10  Q.    And then moving on to Exhibit 4, is this also a posting

11  that you were able to attribute to the defendant under the

12  guugle/screwtube FASCISM account name?

13  A.    Yes.

14  Q.    And then, again, highlighting it so it's a little bit

15  easier to read, what was this -- what did he post on -- and

16  this was all before you got your search warrant; correct?

17  These -- these three posts we're talking about now?

18  A.    Correct.

19  Q.    And what was the content of this comment?

20  A.    "I've got 6 million rounds of ammo for them and anyone

21  who supports them.  That is all."

22  Q.    And then moving on to 5, this was also another posting

23  from the defendant.  And, again, highlighting it on the second

24  page.  What's the relevance of this comment to your search

25  warrant?

1   A.   It states, "Why isn't anyone just shooting these

2   worthless fuckers?  If I stop at an intersection and someone

3   starts banging on my car and screaming threats of violence,

4   they get a bullet in the head.  No hesitation and no questions

5   asked."

6   Q.   And so when you applied for your search warrant, were

7   there any concerns that there was going to be weapons in the

8   home?

9   A.   Yes.

10  Q.   Now -- and you were present during the execution of the

11  search warrant; correct?

12  A.   I was.

13  Q.   I apologize.  I'm actually -- I accidental skipped 7.

14  I'm going to go back a step.  Can you look at what's marked as

15  Government's Exhibit 7a, 7b, and 7c?

16  A.   Yes.

17  Q.   And these are on legal-sized paper.  What is on 7a?

18  A.   7a is a search query for how to kill YouTube employees.

19  Q.   And where did you locate this information?

20  A.   On the computer in the -- that was seized from the

21  subject's residence.

22  Q.   And so did you do a forensic exam of the defendant's

23  computer after it was seized from his home?

24  A.   I did.

25  Q.   And then you came across this search term on how to kill

1   YouTube employees?

2   A.    Yes.

3   Q.    And then moving to 7b, what are we looking at here?

4   A.    This is a search for the Twitter headquarters location.

5   Q.    And this was also something you located on the

6   defendant's computer when you were doing a forensic exam?

7   A.    Yes.

8   Q.    And why is it relevant that he searched for the location

9   of Twitter?

10  A.    He was threatening to kill Twitter employees.

11  Q.    Were there -- I know one of the e-mail accounts was

12  called jackisaterrorist.  Was there several threats against

13  Jack?

14  A.    Yes.  Jack Dorsey is the CEO of Twitter.

15  Q.    And did he ever threaten in his postings to kill

16  Jack Dorsey?

17  A.    Yes.

18  Q.    And then on 7c, what are we looking at on this page?

19  A.    This is also looking for Twitter locations.

20  Q.    Okay.  So that was, again, information -- information on

21  where Twitter was located; correct?

22  A.    Correct.

23  Q.    All right.

24          **MS. LANG:**  So, at this time, Your Honor, I'd like to

25  move for the admission of 7a, b, and c.

1      **THE COURT:**  Any objection to those three,

2  Mr. Schwartz?

3      **MR. SCHWARTZ:**  Your Honor, I'll make a hearsay

4  objection, also a foundational objection, that there's lack of

5  foundation that this extraction can be attributed to the

6  defendant.

7      **THE COURT:**  Any response?

8      **MS. LANG:**  I -- I can follow-up with some more

9  questions.  But it was on his -- his computer in his home with

10  these search terms.  So it really goes more, I think, to the

11  weight of the evidence than whether or not it's admissible.

12      **THE COURT:**  If you want to lay more of a foundation,

13  that would be fine.  So I'll hold up on ruling until we hear

14  the additional questions, Mr. Schwartz.

15      **MR. SCHWARTZ:**  Thank you.

16  **Q.    (By Ms. Lang)** Agent Storm, you did the forensic analysis

17  of the defendant's computer; correct?

18  A.    Correct.

19  Q.    And do you remember what computer you located 7a, b, and

20  c?

21  A.    Yeah.  It was at the residence.

22  Q.    At the residence.  And was there any other identifiers on

23  that computer that showed that it belonged to the defendant?

24  A.    Yes, there was.

25  Q.    And what were those?

1    A.   The user account that was used to get into the computer

2    and log in, and also the e-mail addresses that we had

3    attributed to the defendant.

4    Q.   So the e-mail addresses you had already attributed to the

5    defendant through your legal process were located on this

6    computer?

7    A.   They were.

8              **MR. SCHWARTZ:**  Objection.  Leading, Your Honor.

9              **THE COURT:**  I'll overrule the objection.

10             You may answer the question.

11   A.   Yes.

12   **Q.   (By Ms. Lang)** And you said the -- there was another --

13   what was the beginning of your last part?  There was another

14   e-mail address or another account identifier that came back to

15   the defendant?

16   A.   So there was a user name on the account that we can

17   attribute to the defendant.

18   Q.   Based on your surveillance and other investigation you

19   did leading up to the search warrant, did anyone else live at

20   the home with the defendant?

21   A.   No.

22   Q.   Was there any evidence on the computer that someone

23   besides the defendant had been using it?

24   A.   No.

25             **MS. LANG:**  Your Honor, at this point, I'd like to

 1   admit 7a, b, and c.

 2            **MR. SCHWARTZ:**  Same objection, Your Honor.

 3            **THE COURT:**  I'm going to overrule your objection.  I

 4   find a sufficient foundation has been made and that if these

 5   are statements by a party opponent, they're admissible under

 6   the hearsay rule.  So Exhibits 7a, b, and c are admitted into

 7   evidence.

 8   **Q.   (By Ms. Lang)** Agent Storm, you said you were at the

 9   execution of the search warrant of the defendant's home.  Were

10   photographs taken when the FBI executed the search warrant?

11   A.    They were.

12   Q.    And did -- did you have an opportunity to review the

13   photographs that were taken of the search warrant?

14   A.    Yes.

15   Q.    And did those all reflect how the home looked when the

16   FBI first breached it?

17   A.    Yes.

18   Q.    Now I'm going to move your attention to Exhibit 8 as well

19   as 9a through 9e.  Could you just take a -- flip through those

20   for me, those photographs.

21   A.    Yes.

22   Q.    Well, are those photographs?

23   A.    They are photographs.

24   Q.    And what are they photographs from?

25   A.    They are photographs from the search of the residence.

1  Q.   And do they appear to accurately reflect how the

2  residence looked when the search warrant was executed in

3  October of 2020?

4  A.   Yes.

5          **MS. LANG:**  Your Honor, at this time, I'd like to

6  admit 8, 9a through 9e.

7          **MR. SCHWARTZ:**  No objection, Your Honor.

8          **THE COURT:**  Those exhibits, 8, 9a through 9e, are

9  admitted into evidence.

10  **Q.   (By Ms. Lang)** And moving to Exhibit 8, what is depicted

11  in that photograph?

12  A.   It appears to be a child-like sex doll.

13  Q.   And where was that located within the defendant's home?

14  A.   It was in a closet.

15  Q.   And then moving on to 9a, what is that a picture of?

16  A.   It is a picture of gun boxes.

17  Q.   And where were those located in the home?

18  A.   They were located in the kitchen.

19  Q.   And were there guns in those boxes?

20  A.   There were.

21  Q.   And what type of weapons were they?

22  A.   Assault rifles.

23  Q.   How many assault rifles did the FBI locate in the home?

24  A.   Eight.

25  Q.   And was there any ammunition that accompanied those

1   assault rifles?

2   A.   Yes.

3   Q.   And this is -- I'm posting 9b.  What's depicted here?

4   A.   Hanging on the wall are racks where you can hang

5   magazines for assault rifle magazines.

6   Q.   And then 9c and d are similar.  What are we looking at

7   here?

8   A.   Assault rifles found in those gun boxes.

9   Q.   And there is ammunition with them?

10  A.   Correct.

11  Q.   Correct?

12  A.   Yes.

13  Q.   And that was -- those were the assault rifles that were

14  located in the kitchen area?

15  A.   Correct.

16  Q.   And then, lastly, 9e.  What's depicted here?

17  A.   They are drums, a magazine drum, used -- containing

18  ammunition for the assault rifles.

19  Q.   While you were at the defendant's home executing the

20  search warrant, did you or another agent ever attempt to get a

21  statement from the defendant?

22  A.   We did.

23  Q.   And how -- where -- where were you when that happened?

24  A.   We were in a vehicle just outside of the house.

25  Q.   And did you read him his *Miranda* rights or provide him

1    his *Miranda* rights?

2    A.   We did.

3    Q.   And how did you do that?

4    A.   We read from a form and he signed the form.

5    Q.   And did you ask him any questions after he signed the

6    *Miranda* rights form?

7    A.   We did.

8    Q.   And what did -- did he answer them?

9    A.   Yes.

10   Q.   And was this taped in any way?

11   A.   It was not.

12   Q.   And, just generally, what did he tell you?

13   A.   He told us about himself, a little bit of background,

14   that he had a girlfriend who had children and that he would

15   take care of the children.

16   Q.   After -- did he take ownership at all of any of the

17   electronic devices in the home or the e-mail accounts?

18   A.   He did not during that.

19   Q.   Okay.  And then did he admit to leaving comments

20   sometimes on the YouTube platform?

21   A.   He did.

22   Q.   And then when he was asked about threats, did he invoke?

23   A.   He invoked after that, yes.

24   Q.   And after he invoked his right to an attorney, what did

25   you do?

1    A.   We did not ask him anything further.

2         **MS. LANG:**  Your Honor, I don't have any further

3    questions at this time.  And I believe you read them out loud

4    already, but I believe all the exhibits on the list except for

5    No. 2 have been admitted.

6         **THE COURT:**  Deputy Shirley, is that correct?

7         **THE CLERK:**  Yes, Judge.

8         **THE COURT:**  All right.

9         **MS. LANG:**  Thank you.

10        **THE COURT:**  Cross-examination?

11        **MR. SCHWARTZ:**  Thank you, Your Honor.

12                        **CROSS-EXAMINATION**

13   **BY MR. SCHWARTZ:**

14   Q.   Agent Storm, let's start with a few questions about the

15   beginning of your investigation into Mr. Thilges.  Okay?

16   A.   Sure.

17   Q.   All right.  Let me grab my water.

18        My understanding is that you had been conducting

19   investigations into online threats or this sort of activity

20   for a few months, did you say?

21   A.   On this particular case?

22   Q.   No, no.  In general, please.

23   A.   Yes, in general.

24   Q.   Was your testimony, was it six months?

25   A.   For this case?

1   Q.    No.   In general, these types of investigations.

2   A.    I've been an agent since 2016, and throughout that, I

3   would deal with threats of violence.

4   Q.    I understand.   So the investigation of threats of

5   violence, that wasn't some special unit you were assigned to

6   where your work was primarily or exclusively that?

7   A.    It was not exclusively.   I was on a cyber squad.

8   Q.    It was not exclusively when you were on the cyber squad?

9   A.    I was on the cyber squad when the investigation took

10  place.

11  Q.    And when you were on the cyber squad, though, were those

12  investigations pretty much focused on this sort of alleged law

13  violation?

14  A.    No, it was not.

15  Q.    Okay.   Fair enough.   But you had some experience with

16  this sort of stuff?

17  A.    I did.

18  Q.    Okay.   And that experience involved a fair amount of time

19  on the internet?

20  A.    Yes, it did.

21  Q.    And perusing various -- various websites and platforms,

22  social media platforms?

23  A.    Yes, sir.

24  Q.    Okay.   Now, I know you testified that you received some

25  notification from a social media platform of these threats and

1  that was where your investigation began; is that right?

2  A.    Correct.

3  Q.    Okay.  And that came from, was it Google or Facebook?

4  A.    Google.

5  Q.    It came from Google.  All right.  And you were sent some

6  information, I guess, by Google, apparently -- or I guess I

7  shouldn't say apparently -- that were, for the most part,

8  contained in Exhibits -- what you've been shown as Exhibits --

9  let me make sure I get this right.  Was it the videos that

10 were referenced in Exhibits 3, 4, and 5 that were sent to you

11 as part of the original information?

12 A.    Yes.

13 Q.    All right.  Were Exhibits 3, 4, and 5 pretty much the

14 beginning of the investigation?  Is that fair to say?

15 A.    It was part of the beginning.

16 Q.    What was the very beginning?

17 A.    The information that we received from Google containing

18 the threats of violence.

19 Q.    But the threats of violence, are you referring to the

20 ones attached to the video in Exhibit 3 -- the YouTube videos

21 in Exhibit 3, 4 --

22 A.    Yes.  Those three, in particular, are comments that were

23 made on YouTube videos showing that he had the means to carry

24 out the threats that he was alleging that he was going to

25 make.

1    Q.   But were the -- were the comments in Exhibit 3, 4, and 5
2    the first things you were sent by Google or -- yeah, by
3    Google?
4    A.   I was sent other threats as well.
5    Q.   What's that?
6    A.   I was sent other threats as well.
7    Q.   Have you testified as to them today?
8    A.   Some of them are inside the search warrant from
9    Exhibit 1.
10   Q.   Okay.  But you did, obviously -- well, maybe not
11   obviously.  You got all of that stuff, essentially, at the
12   same time?
13   A.   I got it throughout the investigation.  Yes.
14   Q.   All right.  And when you got that stuff from Google, you
15   started -- did you go to those YouTube channels and look at
16   this stuff for yourself?
17   A.   I did.
18   Q.   It was still up?
19   A.   Some of them were.  Some of them were suspended and
20   removed.
21   Q.   Which ones were still up?  Let's talk about Exhibits 3,
22   4, and 5.  Was Exhibit 3 still up?
23   A.   Yes.
24   Q.   4?
25   A.   Yes.

1  Q.    5?

2  A.    Yes.

3  Q.    All right.

4  A.    Those are screenshots that I took.

5  Q.    Okay.  So that means that when Google became aware of

6  these, as far as you know, based on your expertise, they

7  didn't strike them; right?

8  A.    Some of them, they did.  Some of them, they did not.

9  Q.    Well, I'm talking about Exhibits 3, 4, and 5.

10 A.    They did not.

11 Q.    Okay.  And in terms of your affidavit --

12         **MR. SCHWARTZ:**  I'm sorry, Your Honor.

13         **THE COURT:**  Take your time.

14 **Q.    (By Mr. Schwartz)** Since the comments that you put in your

15 affidavit for -- in support of the application for the search

16 warrants, since those comments in there aren't -- there's no

17 correlation that I can see to the exhibit numbers, that's

18 what's taking me a second, just to keep these --

19 A.    No problem.

20 Q.    -- so I can ask you about these.  Right?  All right.

21         **MS. LANG:**  Ken?

22         **MR. SCHWARTZ:**  Yeah.

23         **MS. LANG:**  Those are in paragraph 26 of Exhibit 1.

24         **MR. SCHWARTZ:**  Got it.  Thank you.

25         **MS. LANG:**  Exhibits 3, 4, 5.

1      **MR. SCHWARTZ:**  Yep.  Thanks.  Okay.

2   **Q.    (By Mr. Schwartz)** What's your understanding of Google's

3   policy regarding posts or comments that they strike and remove

4   from the -- from the platform?

5   A.    I'm not familiar with what they strike or don't strike.

6   Q.    But you know, though, that in the course of your

7   investigation, similar investigations, threats, that when

8   something that they interpret to be a threat is posted, they

9   take it down; right?

10  A.    Sometimes.

11  Q.    Their goal is to take it down, correct, as far as you

12  know?

13  A.    As far as I know.

14  Q.    All right.  And, obviously, you're aware of some times

15  when they do that.  Right?  When you say "sometimes," do you

16  mean when they come across it and see it because, obviously,

17  there's millions of videos?

18  A.    Correct.

19  Q.    Okay.  But the videos contained at least in 3, 4, and 5,

20  they obviously had come across because they sent them to you;

21  right?

22  A.    Correct.

23  Q.    All right.  But for whatever reason, they didn't strike

24  those, 3, 4, and 5; right?

25  A.    Correct.

1    Q.    Those were still on the public -- in the public domain so

2    to speak; right?

3    A.    Correct.

4    Q.    All right.  So let's talk a little bit more about --

5    about the investigation.  After viewing this information

6    regarding your first search warrant application, not the one

7    after you did the phone extraction, but the first one, you

8    took -- I'm sorry.  And you said that was in 20- -- when did

9    your investigation begin?

10   A.    In 2019.

11   Q.    Okay.  And you said that there had been postings from

12   what you believed to be -- what you believed to originate from

13   accounts associated with Mr. Thilges for some time before

14   that; right?

15   A.    There was.

16   Q.    Okay.  And you said that you felt as though those

17   postings got more violent or more aggressive, I think was the

18   word you used; right?

19   A.    Correct.

20   Q.    Okay.  So from the time that you got the initial

21   information from Google to the time that you applied for a

22   search warrant, when was that?  How long was that?  I guess I

23   could break that down.

24         When did you get the first report, I'll call it,

25   from Google?

1   A.    In 2019.

2   Q.    When in 2019?

3   A.    I believe the spring.

4   Q.    The spring?  Is that noted anywhere in any of your 302s?

5   A.    Yeah.  It would be part of the case file, case opening.

6   Q.    All right.  So some time in the spring of 2019 is when

7   you get some information and that's when you just start

8   looking at Mr. Thilges or is that when you did your best to

9   find out who the person was associated with these postings?

10  A.    We, obviously, didn't know who the person was behind the

11  postings, so we had to determine that through the

12  investigation.

13  Q.    All right.  And in doing that, you were first able to

14  identify the IP address.  That came from Google, did it?

15  A.    It was part of the log-in to the account that was being

16  used to post the threats.

17  Q.    Right.  So -- and then the IP address, the internet

18  service provider associated with that IP address, you obtained

19  that through public information?

20  A.    No.  I obtained that through a subpoena.

21  Q.    What exactly did you subpoena to get the internet service

22  provider information?

23  A.    The IP address was registered to Charter/Spectrum

24  internet, and so I subpoenaed them for the records, for the

25  subscriber of that IP address.

1    Q.   I got it.  You're ahead of me.  The IP address is owned

2    by, for lack of a better term, an internet service provider.

3    In this case, Charter; right?  That's public information;

4    right?

5    A.   Uh-huh.

6    Q.   Yeah?

7    A.   Yes.  The IP address is a public IP address.

8    Q.   And what ISP hosts that -- I'm sorry, what -- yeah.  What

9    ISP hosts that IP address, that's publicly available

10   information as well; right?

11   A.   I'm not sure I understand your question.  It's an

12   IP address owned by Charter/Spectrum.

13   Q.   I get it.  There's millions of IP addresses; right?

14   A.   Correct.

15   Q.   And in blocks, they're assigned to various internet

16   service provider companies.  Charter's one of them; right?

17   A.   Correct.

18   Q.   And then, obviously, they then assign them out to some of

19   their subscribers, the houses, whatever; right?

20   A.   Correct.

21   Q.   Okay.  So you determined initially that the IP address

22   that you understood to be associated with these comments or

23   these e-mails was being hosted by Charter; right?

24   A.   Correct.

25   Q.   And then you sent off a subpoena to Charter asking who

1   the person or company, whatever, subscriber, to that

2   IP address is; right?

3   A.    Correct.

4   Q.    And was that IP address a static IP address?

5   A.    IP addresses change, but at that time that those

6   IP addresses were used, they were registered to Matthew

7   Thilges.

8   Q.    So let's talk about IP addresses.  You know what a static

9   IP address is; right?

10  A.    I do.

11  Q.    And the static IP address generally stays the same.  It

12  doesn't change per log-in; correct?

13  A.    Correct.

14  Q.    And then what's the other type of IP address called?

15  A.    A dynamic IP address.

16  Q.    And the dynamic IP addresses may very well change;

17  correct?

18  A.    Correct.

19  Q.    All right.  Do you know as you sit here today if the

20  IP address that came back to the house that Mr. Thilges was

21  living in was dynamic or static?

22  A.    Getting into the records, the IP address was static for a

23  period of time and then would change.  And so throughout the

24  course of the investigation, the IP addresses did change.  And

25  through different IP addresses, they all came back to

1   Charter/Spectrum to the subject.

2   Q.   However, in order to determine the subscriber

3   information, who you claim to be Mr. Thilges, for an

4   IP address, you would need a new subpoena to get that data for

5   every IP address change; correct?

6   A.   Correct.

7   Q.   How many subpoenas did you request then or did you serve

8   on Charter?

9   A.   I would have to look back at my investigation, but I

10  believe I served at least three to Charter.

11  Q.   At least three to Charter?

12  A.   Yes.

13  Q.   You didn't serve any to anybody else?

14  A.   I served them to Google and other social media companies.

15  Yes.

16  Q.   I'm sorry.  I meant internet service providers.  Only

17  Charter?

18  A.   Yes.

19  Q.   Okay.  But your testimony here is that the IP address

20  changed a lot more than three times; right?

21  A.   It did.

22  Q.   Okay.  So what IP address was associated with

23  Government's Exhibit 3?

24  A.   I don't know what specific one right now, but it was

25  attributed to Mr. Thilges.

1  Q.    But -- but let me just make sure I get this straight.

2  Each time a comment was made to one of these videos, an

3  IP address is associated with that comment; right?

4  A.    The comment is used through an account that is created at

5  Google and that Google then logs the log-in information which

6  includes IP addresses.

7  Q.    So the Google account has its own IP address or it has an

8  IP address associated with when it reaches out and makes a

9  comment; right?

10  A.    I don't understand the direction you're going.  The

11  account is being used by an individual and that is being

12  logged into from an IP address that the individual is coming

13  from.

14  Q.    That's right.  So let me just try to make sure I

15  understand all this stuff.  The IP address, for lack -- I'm

16  going to put -- I'm going to try to break it into, sort of,

17  lay terms for me.  The IP address is sort of like the serial

18  number assigned to the modem that that communication went

19  through; fair?

20  A.    Fair.

21  Q.    Okay.  And that serial number assigned to that modem

22  changes; right?

23  A.    The serial number on the modem does not change.

24  Q.    The serial number is what I'm calling the IP address.

25  Okay?

1    A.    Okay.

2    Q.    So that number associated with the log-in changes the

3    IP address; right?

4    A.    It can change.  Yes.

5    Q.    But it did change, though, in this case.  You said that

6    earlier; right?

7    A.    Yes.

8    Q.    Okay.  So here's my question.  The -- an individual gets

9    on a computer at a specific location.  Okay?  Let's say

10   Mr. Thilges' address.  It had a Charter/Spectrum internet

11   service account; right?

12   A.    Yes.

13   Q.    Okay.  So somebody gets on a computer there and reaches

14   out to the internet.  Charter assigns an IP address to that

15   reach-out; right?

16   A.    Yes.

17   Q.    And then let's say that somebody else comes around and

18   reaches out to the internet through that same modem.  Charter

19   assigns, in the dynamic IP situation, another IP address;

20   right?

21   A.    No.  There's only one IP address assigned to a router and

22   modem at a time.  There can be multiple people on a router at

23   a time.

24   Q.    There can.  But you remember what we spoke about with

25   static IP address and with dynamic IP address addresses;

1   right?

2   A.   Correct.

3   Q.   And you said, if I understood you correctly, that the

4   modem at Mr. Thilges' house, okay, reaches out multiple times,

5   obviously, to various websites theoretically; right?

6   A.   As the user on the computer or phone is trying to do so.

7   Yes.

8   Q.   That's what I mean.  Thank you.  And then in the dynamic

9   IP address setting, every time that computer reaches out, it

10  generates a new IP number?

11  A.   No.  That is not correct.

12  Q.   So tell me what you meant when you said that there was a

13  dynamic IP address here.

14  A.   The IP address did change, but it did not change multiple

15  times over the same course of the same day.  So in Charter, I

16  don't know how often they change, but they do not change

17  frequently, and definitely not as frequent as daily.  So they

18  may change every three months to six months.

19  Q.   Okay.  So what you're saying here, I think, and don't let

20  me -- I know you're not going to let me put words in your

21  mouth -- is that the IP address from, we're going to say

22  Mr. Thilges' Charter modem account, does change sometimes;

23  right?

24  A.   It does.  Yes.

25  Q.   But you're not prepared to testify under oath here today

1    as to how frequently it changed; is that right?

2    A.   I don't recall how frequently, but it did change.  Yes.

3    Q.   Okay.  So you're also, it sounds like, not prepared to

4    testify as to whether or not it changed for any or all of the

5    postings that you testified to on direct; correct?

6    A.   All of the accounts that left those comments were

7    comments that were used and created by the defendant.

8    Q.   Well, hold on.  Let me just say this.

9           **MS. LANG:**  I'm going to object to this line of

10   questioning.  In the three motions that were filed in this

11   case to challenge the search warrant, there was no mention of

12   anything dealing with IP addresses.  So who is attributed on a

13   computer to an IP address is more of a question for trial as a

14   "who done it" and not this hearing here.

15          **THE COURT:**  So why isn't this a trial issue,

16   Mr. Schwartz?

17          **MR. SCHWARTZ:**  It's a foundational issue as to

18   whether or not these statements can, by a preponderance of the

19   evidence, be attributed to Mr. Thilges.  I think that what

20   Agent Storm is testifying to, and I'm obviously trying to

21   ferret this out, is that these IP addresses do change and

22   that's what they're attributing -- that's how they're

23   essentially connecting or attempting to connect Mr. Thilges to

24   these posts.  And I think that if these IP addresses change,

25   that that, obviously, goes towards whether or not that's the

 1   case.

 2          And it also goes towards the validity of these

 3   warrants or certainly the information received from them

 4   because he's testified that he obtained, I think he said, more

 5   than three, I don't remember, administrative subpoenas when

 6   IP addresses change.  This is something I haven't gotten into

 7   a whole lot yet.  But if that's the case, I think he would

 8   have arguably needed additional search warrants, or, if

 9   they're going to attribute statements to Mr. Thilges, I think

10   it has to be specific to IP addresses that he lawfully

11   obtained information as to.

12          So I'll admit that it's not in my motion, and quite

13   frankly, you don't see me reading questions, Your Honor.  I

14   mean, this is the sort of thing I'm hearing and I'm thinking,

15   Okay, how did they do this?  So I mean, to some degree, I'm

16   definitely trying to understand the process behind how

17   Agent Storm got to where he is today.  So I -- I mean, I think

18   it's relevant.  I think it goes towards these very issues,

19   what we're talking about.

20          **THE COURT:**  Ms. Lang?

21          **MS. LANG:**  Your Honor, in the search warrant

22   affidavit, paragraphs 5 through 24, detail how Agent Storm

23   found the IP addresses and how he attributed them back to the

24   defendant over a period of time.  Again, I was not given any

25   notice that those IP addresses were going to be an issue today

 1  at this motion to suppress.  So I'd still object to the line

 2  of questioning.

 3          **THE COURT:**  So as I understand the agent's

 4  testimony, each of the comments that are referred to in the

 5  affidavit were all attributed to IP addresses that he has

 6  confirmed to be coming from Mr. Thilges' house.  Do I

 7  understand your testimony correctly?

 8          **THE WITNESS:**  Yes.  And there's also additional

 9  information that connected to the defendant.

10          **THE COURT:**  And did you obtain the IP addresses for

11  each of these statements contained in the affidavit by process

12  of subpoena issued to Charter?

13          **THE WITNESS:**  Yes, sir.

14          **THE COURT:**  Does that answer your question,

15  Mr. Schwartz?

16          **MR. SCHWARTZ:**  Yeah, I think it does.  You did a

17  better job than I did.  Thank you.

18          **THE COURT:**  Well, I'm -- never mind.  I'll allow you

19  to proceed.

20          **MR. SCHWARTZ:**  Thank you.  Okay.

21          **THE COURT:**  But I will sustain the Government's

22  objection.

23          **MR. SCHWARTZ:**  Thank you.

24  **Q.   (By Mr. Schwartz)** Let's talk a little bit more about

25  subscriber information and that.  Obviously, when you go to

1   Charter and you get the name of a person or a company

2   associated with a particular account, they give you -- they

3   give you that name; right?  In this case, they gave you

4   Mr. Thilges' name?

5   A.   Correct.

6   Q.   Okay.  But, obviously, that's the first step in

7   identifying who may or may not have actually made postings or

8   comments; right?

9   A.   It's part of the steps that we take to investigate to

10  identify who uses the accounts.

11  Q.   I mean, it's the first step where you actually identify a

12  human being's name generally; right?

13  A.   Sometimes.

14  Q.   In this case, it was; right?

15  A.   Yes.

16  Q.   Okay.  And so then you get that information and you

17  conduct some investigation into Mr. Thilges; right?

18  A.   Correct.

19  Q.   You conducted some physical surveillance at his home;

20  right?

21  A.   Yes, sir.

22  Q.   I think you conducted some investigation into some

23  IP addresses that were associated with the place that you

24  think he may have worked at; right?

25  A.   Yes.

1   Q.   Okay.  And what else did you do in terms of the

2   investigation into, sort of, the physical aspects, the

3   address, that sort of thing?

4   A.   We also looked at phone numbers that were associated with

5   the accounts and further IP address analysis.

6   Q.   Okay.  Utility bills for the address?

7   A.   They were all registered to the defendant.

8   Q.   Did you -- did you physically go and examine all of the

9   utility accounts and the addresses?

10  A.   I did not.

11  Q.   How do you know they were all registered to Mr. Thilges?

12  A.   Through the subscriber records from Charter.

13  Q.   Through what records through Charter?

14  A.   The IP address was registered to the defendant.

15  Q.   Oh, I know.  I meant other utilities like electricity,

16  sewage, these sorts of things.

17  A.   Oh.  We looked at, like, other records for where his

18  vehicle was registered and his vehicles were registered to

19  that address, and through physical surveillance, we observed

20  those vehicles at that residence.

21  Q.   Okay.  How many days did you conduct physical

22  surveillance of his house?

23  A.   I think it was two or three days.  I don't recall exactly

24  how many days.

25  Q.   Okay.  And through the course of your investigation, I'm

```
 1   talking about before the execution of the search warrant, or

 2   probably before you got the search warrant, you did come

 3   across another name generally associated with that address,

 4   didn't you?

 5   A.   With that address?

 6   Q.   With Mr. Thilges, that address, sure.

 7   A.   There was other names that we came across as associates

 8   of Mr. Thilges.  Yes.

 9   Q.   Was one of them Jeanette Phelps?

10   A.   It was.

11   Q.   And did you understand or learn who Jeanette Phelps was?

12   A.   Yes.

13   Q.   And what did your investigation tell you about that?

14   A.   She was the girlfriend of the defendant.

15   Q.   All right.  And did you also learn in the course of your

16   investigation that she lived sometimes at the home there with

17   Mr. Thilges?

18   A.   She had a separate home and -- but she was known to

19   frequent the residence.

20   Q.   Did you have eyes on that at some point in time?

21   A.   I never saw her at Mr. Thilges' residence.

22   Q.   How was it you determined then that she would frequent

23   his residence from time to time?

24   A.   He admitted that she would.

25   Q.   Okay.  And, in fact, you noticed things in the home.  It
```

1   was a mobile home.  You saw indicia of a female living there;

2   correct?

3   A.   It did not appear to me that a female lived there

4   full-time.  But there were other kid toys, other things to

5   suggest that children and somebody else frequented the house.

6   Q.   Sure.  Okay.  So -- and you know why I'm asking you these

7   questions; right?  Because, obviously, that would mean,

8   potentially, that other people may have had access to that

9   IP address; right?

10  A.   Yes.

11  Q.   Okay.  And that wouldn't necessarily be through a

12  computer in that house; correct?

13  A.   No.  You could use any device that could connect to the

14  internet.

15  Q.   There was Wi-Fi in the house?

16  A.   Yes.

17  Q.   All right.  And did you -- did you examine that Wi-Fi for

18  security?

19  A.   We did not examine it for security.  No.

20  Q.   So you can't testify today as to whether or not that

21  Wi-Fi was password-protected or not?

22  A.   I do not know.

23  Q.   If it was not password-protected, anyone could have

24  gotten onto the Wi-Fi there, in theory; correct?

25  A.   In theory.

1   Q.    Okay.  This was a single-wide trailer?

2   A.    Yes.  I believe so.

3   Q.    Okay.  So it's fair to say that if this was an

4   unprotected Wi-Fi network, generally speaking, somebody with a

5   wireless device could log in from outside the building?

6   A.    In theory.

7             **MS. LANG:**  Objection.  Speculation.

8             **THE COURT:**  I'll overrule the objection.

9   **Q.    (By Mr. Schwartz)** It's a -- I mean, it's a trailer;

10  right?  We're not talking about a big concrete building.  Is

11  that fair to say?

12  A.    Correct.

13  Q.    And in your expertise with computers, I think you were

14  about to answer it, but somebody could be outside and log in.

15  Fair to say?

16  A.    In theory, if it was unsecured.

17  Q.    If it was unsecured.  But the signal strength and all

18  that, we're not talking about; right?

19  A.    Huh-uh.

20  Q.    No?  Okay.  You're nodding a little bit, but I know she's

21  trying to -- or the recording doesn't get that.  You're

22  agreeing with me?

23  A.    Yes.

24  Q.    Okay.  Fair.  So, all right.  So that being the case, do

25  you know if Ms. Phelps was in the house or accessing the

1   network on the dates of any of the postings that you put in

2   your search warrant affidavit?

3   A.    I don't know if she would have been there or not.

4   Q.    Okay.  So do you know if anybody else was there?

5   A.    She had children that also frequented that residence.

6   Q.    These particular posts that are the basis of your search

7   warrant application, you can't testify, specifically, that

8   Mr. Thilges made those particular comments; correct?

9   A.    I believe that he did through the course of our

10  investigation that he was the user of those accounts and the

11  user of those accounts posted those threats.

12  Q.    Yeah.  Okay.  But you're -- that's an extrapolation that

13  you're basing on a number of things; right?

14  A.    Correct.  IP address analysis, cell phone, and his place

15  of employment.

16  Q.    Sure.  Okay.  So -- but there were a lot of comments;

17  right?

18  A.    There were.

19  Q.    I think you indicated one of them was made from that

20  IP address at that engineering company where he worked; right?

21  A.    Yes.  There was a log-in from his place of work.

22  Q.    One; right?

23  A.    Yes.  There was also a previous one from his previous

24  place of employment as well.

25  Q.    Those weren't in the affidavit, though, were they?

1    A.    They are in the affidavit.  Yes.

2    Q.    Okay.  So, also, aside from those two, they all came from

3    what you believed to be an IP address coming out of the

4    trailer; right?

5    A.    There were other IP addresses from a TOR network as well

6    from those accounts.

7    Q.    Okay.  And those, you can't associate to that trailer at

8    all; correct?

9    A.    No.

10   Q.    So the TOR IP addresses, you're not -- you can't testify

11   who those are attributable to; right?

12   A.    No.

13   Q.    All right.  Which ones in the affidavit come from the TOR

14   address?

15   A.    I'd have to look and see which ones came from TOR.

16   Q.    You have it in front of you?

17            **MS. LANG:**  It's paragraph 17a.

18   A.    Yes.  The account guugleisfascistpig used log-ins from

19   TOR.

20   **Q.    (By Mr. Schwartz)** How many -- let's see.  So that means

21   that all of the comments that you were attributing to

22   guugleisfascistpig@gmail.com came through this TOR IP address;

23   right?

24   A.    I don't know that all of them came through there.  There

25   were also log-ins from the Charter account from which he was

1   the subscriber on through that account.

2   Q.   Through the guugleisfascistpig account?

3   A.   Correct.

4   Q.   Okay.  But -- so is it fair to say then that out of all

5   the threats, as you categorized them, that are set forth in

6   your affidavit in support of the search warrant, you can't

7   testify here today as to which ones came from the TOR

8   IP address and which ones came from an IP address that you

9   know --

10  A.   I don't know which threats came from TOR or Charter.  I

11  just know that the user of the account used log-ins and had

12  log-ins from Charter and TOR, and that the Charter log-in was

13  Mr. Thilges.

14  Q.   I think I understand that.  But if I also understand what

15  you're saying, log-ins through the TOR account, you said a

16  moment ago, you can't attribute necessarily to Mr. Thilges;

17  right?

18  A.   I cannot.

19  Q.   You've listed -- you've listed several alleged threats.

20  I think that's, essentially, paragraph 25 of the -- of your

21  affidavit.  Is that -- actually, it's 25 and 26.  Fair to say?

22  A.   Yes.

23  Q.   Okay.  Some of those came through this TOR IP address?

24  A.   They could have.

25  Q.   What?

1    A.    They could have.

2    Q.    Okay.  But you don't know as you sit here today which

3    ones came through the TOR address?

4    A.    No, I do not.

5    Q.    So that means that, in light of your testimony a couple

6    of minutes ago, the threats here that came from the TOR

7    address, your testimony is you can't attribute to Mr. Thilges;

8    right?

9    A.    I'm saying I can because I have attributed the account

10   that is being used to leave the threats to Mr. Thilges.

11   Mr. Thilges is the one that uses the account.  Regardless of

12   if it's logged in from Charter or regardless if it's logged in

13   from TOR, he is the user of that account leaving the threat.

14   Q.    He was the person who you think set up the account when

15   you say "user"?

16   A.    Yes.

17   Q.    Okay.

18   A.    He was the one using and creating the account.  So

19   regardless of whether he is logging in from TOR or from

20   Charter, he is the one using and creating those accounts.

21   Q.    Okay.  But if an individual shared their log-in

22   information with other people and those other people left

23   comments, you wouldn't -- you wouldn't -- in that case, then

24   those comments wouldn't necessarily be attributable to that

25   person.  Fair to say?

```
 1   A.   I don't believe that he ever shared his log-in

 2   information with anyone.

 3              THE DEFENDANT:  I need to confer with my attorney.

 4              MR. SCHWARTZ:  May I --

 5              THE COURT:  Need a moment, Mr. Schwartz?

 6              MR. SCHWARTZ:  I think I do.  Thank you.

 7              THE COURT:  Okay.

 8              (Defendant conferred with attorney.)

 9              THE COURT:  Mr. Schwartz, just to let you know,

10   we'll break at 11:00, too.  My guess is you won't be finished

11   by then.

12              MR. SCHWARTZ:  Thank you.

13              THE COURT:  But just for a five or ten-minute break.

14              MR. SCHWARTZ:  Thank you.  Thank you, Your Honor.

15   Q.   (By Mr. Schwartz) The log-ins that you're referring to,

16   the comments, I understand you believe they came from

17   Mr. Thilges.  But your testimony is, if somebody else were to

18   log in through those credentials, another person could, in

19   theory, make those postings and comments.  Fair to say?

20   A.   In theory, but I don't believe that to be the case for

21   this case.

22   Q.   I understand.  Okay.  But you would admit that you

23   obviously didn't have surveillance on the keyboard and the

24   computer and anything else in that house when these comments

25   were made.  Fair to say?
```

1   A.    Fair.

2   Q.    Okay.  And just a couple more things.  I think you said

3   there was a computer in the house when you executed the search

4   warrant; right?

5   A.    Yes.

6   Q.    But I just want to clarify that one could log in and make

7   postings from any wireless device that logged into the

8   internet; right?

9   A.    Are you saying that they used that account or that they

10  could just get on the internet?

11  Q.    Well, I'm saying that if somebody wants to use any

12  account, they just -- they get onto the internet and they log

13  into that account; right?

14  A.    They have to create the account and that company records

15  data on who the subscriber of that person is creating an

16  account.

17  Q.    No.  I understand.  But my question is, if somebody

18  else -- let's just narrow it down to his -- his home.  If

19  somebody else is in there, they could access the internet

20  through phones or laptops or many other devices; right?

21  A.    Yes.

22  Q.    And if they have the credentials to log in to the

23  accounts that you're attributing these threats to, they could

24  do that; right?

25  A.    In theory, but I don't believe they did in this case.

 1   Q.   I get it.  Okay.

 2         All right.  Let's talk about the comments that you

 3   put into your affidavit -- into the application for the search

 4   warrant.  Okay?

 5   A.   Yes, sir.

 6   Q.   All right.  So I'm looking at paragraph 25, and if you

 7   need to, you're welcome to look at that.  But paragraph 25a,

 8   the first comment there that you list is from July of 2020;

 9   correct?

10   A.   Correct.

11   Q.   You got your search warrant in October, October 19th of

12   2020; right?

13   A.   Correct.

14   Q.   Okay.  And so you -- July 8, you noted the comment, "I

15   need violence.  I need to kill alphabet/google/youtube

16   employees now."  Right?

17   A.   Correct.

18   Q.   No particular people named in this; correct?

19   A.   Alphabet, Google, and YouTube employees.

20   Q.   Right.  But no particular names, no individuals specified

21   in A; correct?

22   A.   Right.

23   Q.   Okay.

24   A.   Not an individual, but a group.

25   Q.   Okay.  And then paragraph B is asking somebody named

1  Todd, "Please name the best time and place to kill YouTube

2  employees.  Asking for a friend."  Correct?

3  A.   That's what it says.  Yes.

4  Q.   All right.  So we can agree that that's a question to

5  somebody; correct?

6  A.   It might be.

7  Q.   Okay.  July 13.  "Fuck the government.  Kill all

8  democrats.  Start at alphabet/google.  Kill them all."  Right?

9  A.   Correct.

10  Q.   Okay.  In your line of work, how long have you been --

11  you said you've been an agent, doing this since '16?

12  A.   2016.

13  Q.   Okay.  And that was right about the beginning of the

14  election cycle for the election where former President Trump

15  won?  You remember that time frame?

16  A.   Are you --

17  Q.   Let me strike that.

18          You remember the time frame when Donald Trump was

19  running for President?

20  A.   Which time?

21  Q.   Great question.  The first time.

22  A.   Yes.

23  Q.   Okay.  And had you been conducting these sorts of

24  investigations before that time frame?

25  A.   Yes.

1    Q.    Okay.  You would admit that you noticed a marked change

2    in the online atmosphere regarding the left and the right with

3    that campaign.  Fair to say?

4    A.    Yes.

5    Q.    I didn't hear you.

6    A.    Yes.

7    Q.    Okay.  And that -- now I'm talking about political

8    discourse.  All right?  So political discourse is quite

9    prominent online in the various platforms that you're

10   researching; right?

11   A.    Correct.

12   Q.    All right.  And you would admit that it appears as though

13   most of, if not all, of the comments that you set forth in

14   support of your warrant application sort of tend to go to this

15   left and right sort of argument, quite extremely, but yeah?

16   A.    Some of them do.

17   Q.    Okay.  I mean, most of them do; right?

18   A.    Some of them.  Yes.  I wouldn't agree that all of them

19   do.  No.

20   Q.    I didn't say all of them.

21         Okay.  So with this change that you noticed in the

22   cyber space, sort of -- in cyber space and these comments and

23   that, you agree that the commentary, political commentary,

24   became much more vitriolic in that time frame that we're

25   talking about.  Fair to say?

1    A.    There was a lot more activity online.

2    Q.    And a lot of that activity was pretty extreme in terms of

3    what was said.  Fair?

4    A.    I guess you would have to define "extreme."

5    Q.    Okay.  There were a lot of overtures of violence on the

6    internet at that point in time; correct?

7    A.    There was a lot of posts about politics.  But I wouldn't

8    say necessarily that there was an abundance of violence.

9    Q.    Okay.  "Make the world a better place, shoot a democrat

10   in the face."  This wasn't, when you were doing this

11   investigation, the first time you'd seen that statement;

12   correct?

13   A.    No.  That is the first time I've seen that statement.

14   Q.    That was the very first time?

15   A.    Yes.

16   Q.    Okay.  You've since seen that quite a bit though, haven't

17   you?

18   A.    From Mr. Thilges.

19   Q.    But in general.  You've probably even seen T-shirts and

20   things like that?

21   A.    There are political slogans, but these threats are far

22   more violent than other threats that I have ever seen.

23   Q.    What I'm asking though is the slogan, "Make the world a

24   better place, shoot a democrat in the face," unfortunately,

25   that's sort of thrown around rather lightly these days, isn't

1   it?  You've seen that?

2   A.   I would say no.

3   Q.   Okay.

4   A.   I don't think that's being thrown around lightly.

5   Q.   Okay.  You remember reading one of these posts indicating

6   something about wanting dead democrats; yeah?

7   A.   Yes.

8   Q.   And you would admit there were lots of references in

9   these statements to the left and democrats; right?

10  A.   There were.

11  Q.   Okay.  And you remember one specifically that said, "I

12  want dead democrats.  Millions upon millions upon millions

13  upon millions upon tens of millions of dead democrats."  You

14  generally remember that?

15  A.   Yes.

16  Q.   Okay.  "I want to kill them with my own hands."  That

17  sort of stuff; right?

18  A.   Yes.

19  Q.   Okay.  "I also want a million dollars, but that isn't

20  going to happen either."  Correct?

21  A.   Correct.

22  Q.   Okay.  So that statement, "I want tens and tens and tens

23  of millions of dead democrats, but I want a million dollars.

24  That isn't going to happen either."  That wasn't threatening;

25  is that accurate?

1  A.   I believe it's --

2          **MS. LANG:**  Objection, Your Honor.  This is sort of

3  speculation and calling for a legal conclusion.

4          **MR. SCHWARTZ:**  Let me withdraw that, Your Honor.

5  I'll withdraw that question.

6          **THE COURT:**  All right.  You can ask a different

7  question.  It'll be withdrawn.

8          **MR. SCHWARTZ:**  I will.

9  **Q.   (By Mr. Schwartz)** You did not include reference to that

10 statement in your affidavit, did you?  If you want to look, I

11 don't believe it's in there.  In paragraph 25 or 26 of

12 Government's Exhibit 1.

13         **MS. LANG:**  Uh-huh.  1.

14 A.   That one does not appear in the affidavit.

15 **Q.   (By Mr. Schwartz)** Okay.  And that wasn't an accident that

16 that wasn't in the affidavit; right?

17 A.   I'm not sure what you mean by that.

18 Q.   Well, you drafted the affidavit; right?

19 A.   Yes.

20 Q.   Okay.  And you were obviously aware of the statement

21 about the tens and tens of millions of dead democrats at the

22 time you wrote the affidavit; correct?

23 A.   Yes.

24 Q.   Okay.  And you chose not to include that in the

25 affidavit; correct?

1    A.    What date was that post that you were referencing?

2    Q.    I don't know.  But you were aware of it; correct?

3    A.    I was aware of it.

4    Q.    And you chose not to put it in there?

5    A.    Yes.

6    Q.    All right.  Another one.

7    A.    May I ask to see my notes?

8    Q.    I'm sorry?

9    A.    May I ask to see my notes to know when that post was --

10   Q.    I don't have your notes, but I think if the Government

11   wants to help you out with that on the redirect, I'm sure

12   they'll be able to do that.

13   A.    All right.  Thank you.

14   Q.    I don't have your notes up here.  Sorry.

15         You also remember a statement that you saw in the

16   course of your investigation that read, "Donald J. Trump is

17   the greatest president in the history of this nation in the

18   world.  You have a problem with my opinion, tough shit.  You

19   worthless fascist knob bobbin', goo goblin', sperm burpin',

20   range rangin' jack is gonna hang.  I'll be there to watch."

21   I've omitted a few.  You remember that statement generally?

22   A.    I do.

23   Q.    Okay.  And that's another one that's not in your

24   affidavit; correct?

25   A.    Yes.  And I believe if I could see my notes, I could look

1    at the time frame from which those were posted and believe

2    that those two that you're referencing were before the July

3    time frame, when I had testified that I believed in July,

4    moving forward, the threats became more violent.

5    Q.   Okay.  That's fine.  You would agree though that in terms

6    of presenting information to a magistrate that you want to --

7    you're looking to the totality of the circumstances; right?

8    When you present information?

9    A.   Correct.

10   Q.   Okay.  That way nobody's misled.  They get the whole

11   picture.  Fair to say?

12   A.   Correct.

13   Q.   Okay.  You remember a comment that you came across in the

14   course of your investigation about protests out in Portland,

15   Oregon?

16   A.   I'm familiar that there were protests.  Yes.

17   Q.   Do you remember a statement that, I believe in your

18   investigation, you attributed to Mr. Thilges that was

19   mentioning something about going to Portland to commit acts of

20   violence?

21   A.   I'm not sure I know what you're referencing.

22   Q.   Okay.  In terms of the search warrant itself, you

23   testified as to some weapons and some ammunition.  You would

24   agree that there's nothing necessarily illegal about the

25   possession of those weapons and ammunition in this

1   circumstance; right?

2   A.   Not the weapons, but the silencer.

3   Q.   Oh, okay.  Silencers, which I think the law might call

4   mufflers, they're not per se illegal; correct?  One can

5   possess them with an appropriate tax stamp?

6   A.   I believe you must register it and also include a serial

7   number.

8   Q.   Did you search for any sort of registration with regard

9   to that suppressor that you talked about?

10  A.   We did not find any sort of registration at the home.

11  No.

12  Q.   Did you ask for a tax stamp associated with that

13  suppressor?

14  A.   No.  The suppressor did not have a serial number on it.

15  Q.   All right.  I understand you're not an ATF agent.  But do

16  you know whether tax stamps associate serial numbers in every

17  case because some suppressors can be homemade; correct?

18  A.   I'm not familiar enough with that.

19  Q.   Okay.  So you're not prepared -- well, that's fine.

20  Okay.  Nothing else on that.

21        **MR. SCHWARTZ:**  I'm almost finished with regard to

22  that search warrant, Your Honor.  And then the second one

23  won't go as long.

24        **THE COURT:**  Are those questions also for this agent?

25        **MR. SCHWARTZ:**  Oh, that's right.  That's the other

1   agent.  No.  I'm sorry.  I'm almost finished with this agent,

2   Your Honor.

3            **THE COURT:**  All right.  I'll let you finish up and

4   then we'll take a break.

5            **MR. SCHWARTZ:**  Okay.  Thank you.

6            May I have a second, Your Honor?

7            **THE COURT:**  Yes.

8            **MR. SCHWARTZ:**  Okay.  Two questions, Your Honor.

9   **Q.   (By Mr. Schwartz)** The vehicle registrations that you

10  referred to when you were trying to determine who all lived at

11  that particular trailer, what was the address that you

12  associated with those vehicles you saw at the trailer?

13  A.   They were Mr. Thilges' vehicles.

14  Q.   But they weren't all associated to that particular

15  address where that trailer was, if any of them; correct?

16  A.   Correct.  There was another address that was registered

17  to Mr. Thilges.

18  Q.   Okay.  And that was not the address where you saw the

19  vehicles; correct?

20  A.   Correct.

21  Q.   All right.  And you didn't run the Jefferson County real

22  estate records to see who actually owned or lived at that

23  trailer that you were surveilling; correct?

24  A.   I believe Mr. Thilges was renting.

25  Q.   Okay.  And you didn't conduct any surveillance to see if

1    he was or wasn't?

2    A.    We conducted surveillance and he was the one that exited

3    the residence during surveillance.

4    Q.    Okay.  Fair enough.  The -- one of the comments in your

5    application said something about, "I've got 6 million rounds

6    of ammunition"?

7    A.    Yes.

8    Q.    You didn't find anything close to that in the place when

9    you searched it; right?

10   A.    Not 6 million, but we found thousands of rounds of

11   ammunition.

12   Q.    Okay.  So would it be fair to say that the 6 million

13   round statement wasn't true, that that was facetious?

14   A.    It was.  Yes.

15   Q.    All right.  From a contextual point of view, the video

16   contained in Exhibit No. 3 and the comment associated with it,

17   do you remember what was actually going on in Exhibit No. 3,

18   the video?

19   A.    I believe it was a video of a road rage incident, I

20   believe.

21   Q.    Uh-huh.  And contextually speaking, this comment isn't --

22   isn't a direct threat or a threat at all; correct?  It's just

23   a statement?

24   A.    It's showing that he had the mind that he would not

25   hesitate to kill anyone.

1  Q.   Okay.  But, again, if this video was a circumstance

2  where, perhaps, self-defense or some other sort of justifiable

3  use of a weapon would be appropriate, this statement attached

4  to it or the comment attached to it wouldn't necessarily be a

5  threat; right?

6  A.   I took that as he -- his mindset was that he would not

7  hesitate to kill anyone if he needed to.

8  Q.   Okay.  Okay.  Fine.  Under any circumstance, legal,

9  justifiable, or otherwise?

10 A.   There's lots of circumstances.

11 Q.   Sure.  Okay.  Same question, I guess, as to Exhibit 5.

12 Right?  This Google thing here with the green person on the

13 front.  Green thing.

14 A.   Sure.

15 Q.   Okay.  So do you -- the comment that you testified to,

16 "If I stop at an intersection and someone starts banging on my

17 car and screaming threats of violence, they get a bullet in

18 the head."  That one.  That comment.

19 A.   Yes, sir.

20 Q.   That would seem to appear in and of itself to be a lawful

21 threat of self-defense or something, fair to say, in this one

22 itself?

23 A.   That goes to show the mind of the defendant that when he

24 is posting threats, his mind frame is that he will not

25 hesitate to kill anyone in any instance.

1   Q.   But on Exhibit 5, it's referring to if somebody's banging

2   on my car window and screaming threats of violence at me;

3   fair?

4   A.   Sure.

5            **MR. SCHWARTZ:**  Okay.  No other questions,

6   Your Honor.  Thank you.

7            **THE COURT:**  All right.  Thank you very much.

8            We're going to take a ten-minute recess at this

9   time.

10           So, Agent, you're still under oath, but you've

11  finished cross-examination.  You'll have redirect when we come

12  back so don't go too far.

13           **THE WITNESS:**  Yes, sir.

14           **THE COURT:**  But we'll take a break for ten minutes

15  and we'll start back up at 11:15.  All right.

16           **(Court recessed from 11:04 a.m. to 11:18 a.m.)**

17           **THE COURT:**  All right.  Agent Storm, are you ready

18  to go?

19           **THE WITNESS:**  Yes, sir.

20           **THE COURT:**  All right.  Redirect.

21           **MS. LANG:**  Thank you, Your Honor.

22                    **REDIRECT EXAMINATION**

23  **BY MS. LANG:**

24  Q.   Agent Storm, I'm going to turn your attention to

25  Exhibit 1, the search warrant affidavit for the home, and I'm

1   going to direct your attention to paragraphs 5 through

2   approximately 24.  Could you just flip through those for me?

3   A.    Yes.  Yes.

4   Q.    And what types of information did you outline in

5   paragraphs 5 through 24?

6   A.    Information indicating that the subject of the

7   investigation was Matthew Thilges.

8   Q.    And that was through all the information you put in those

9   paragraphs; correct?

10  A.    Correct.

11  Q.    Including how you tied the IP information back to the

12  subject?

13  A.    Correct.

14  Q.    And Magistrate Bodenhausen would have had all that

15  information then when he reviewed the warrant?

16  A.    Yes.

17  Q.    Now, looking at paragraph 21, the heading above that

18  says, "Information related to account

19  jackisaterrorist@protonmail.com."

20  A.    Correct.

21  Q.    And then what does paragraph 21 tell us?

22  A.    That's the registration information of the account from

23  Google on the date in which it was created and the IP address

24  that it was created from and which YouTube channel it was tied

25  to and then log-in accounts.

1    Q.    And that e-mail address, jackisaterrorist, it says in 21D

2    that it was created by an IP address ending in 173; correct?

3    A.    Correct.

4    Q.    And then if you move forward, I believe, to paragraph 22,

5    did you determine through Charter who that IP address ending

6    in 173 was registered to?

7    A.    Yes.  Matthew Thilges.

8    Q.    And then you also found an IP address in paragraph 23

9    that ended in 172 also used for that same e-mail address.  And

10   who was that one registered to?

11   A.    Mr. Thilges.

12   Q.    Okay.  Then moving ahead to paragraph 25, you then --

13   that's the paragraph that then lists the 16 threats you

14   included in the affidavit.  And it says that that -- the

15   beginning of 25, it says that the user associated with those

16   threats was jackisaterrorist?

17   A.    Correct.

18   Q.    And that was, you testified earlier, the third e-mail

19   associated with the defendant; correct?

20   A.    Correct.

21   Q.    And at that -- and that was in 2020 at this point;

22   correct?

23   A.    Correct.

24   Q.    Why had -- based on your investigation, why was he no

25   longer using the two earlier e-mail addresses?

1  A.    I believe because he could no longer post to them because

2  they had suspended the accounts.

3  Q.    And then all of the threats that you list in paragraph 25

4  about violence, those are in 2020; correct?

5  A.    Correct.

6  Q.    And they go up to October of 2020?

7  A.    Correct.

8  Q.    And then you -- what date did you present this to

9  Magistrate Bodenhausen?

10  A.    On the 19th of October.

11  Q.    So just days after that last threat was posted?

12  A.    Correct.

13  Q.    And then paragraph 26 lists some posts, A, B, and C, and

14  those are the same postings that were referenced earlier in

15  Government's Exhibit 3, 4, and 5; correct?

16  A.    Correct.

17  Q.    In paragraph 26, you're talking here about posts that had

18  the mean -- that showed that he had the means and ability to

19  carry out the threats?

20  A.    Yes.

21          **MS. LANG:**  Your Honor, I don't have any further

22  questions.

23          **MR. SCHWARTZ:**  No recross, Your Honor.

24          **THE COURT:**  All right.  Let me ask you just a couple

25  of questions.

1              You mentioned earlier in your testimony that there

2    had been a shooting in 2018 at the YouTube campus; is that

3    correct?

4              **THE WITNESS:**  That's correct.

5              **THE COURT:**  Was that information contained in the

6    affidavit, as best as you can recall?

7              **THE WITNESS:**  I do not believe that information's in

8    the affidavit.

9              **THE COURT:**  All right.  Then looking at paragraph 5

10   of the affidavit, there are quotes which included the names of

11   two specific people.  That is Susan Wojiski, I might guess

12   that pronunciation, who is the CEO of YouTube; is that

13   correct?

14             **THE WITNESS:**  That's correct.

15             **THE COURT:**  And it quotes the phrase, "I would love

16   to stick a sword right through Susan Wojiski."  Is that a

17   quote that came from one of these accounts which you

18   previously had testified to today?

19             **THE WITNESS:**  Yes, it is.

20             **THE COURT:**  And there's a statement indicating

21   multiple threats towards Jack Dorsey, the CEO of Twitter,

22   suggesting that he, quote, must die.  Are those statements

23   that were associated with the accounts you testified to

24   previously today?

25             **THE WITNESS:**  Yes.

1          **THE COURT:**  And on page 11, in paragraph 25O,

2    there's a reference to someone by the name of Whitmer.  They

3    have the legal right to shoot Whitmer on sight.  Is Whitmer a

4    specific individual?

5          **THE WITNESS:**  Yes.  It's the -- I don't know if it's

6    the current or former -- but, I believe, governor of Michigan.

7          **THE COURT:**  Okay.  So these are specific individuals

8    which are identified in the affidavit to which specific

9    threats of violence were made?

10         **THE WITNESS:**  Correct.

11         **THE COURT:**  And then the other threats are to groups

12   of people, whether by their employment or their political

13   view --

14         **THE WITNESS:**  Correct.

15         **THE COURT:**  -- who were threatened?

16         **THE WITNESS:**  Correct.

17         **THE COURT:**  All right.  Those are all the questions

18   I have.  Does that open up any questions on behalf of the

19   United States?

20         **MS. LANG:**  No, Your Honor.

21         **THE COURT:**  Any questions on behalf of the

22   defendant?

23         **MR. SCHWARTZ:**  One moment, please, Your Honor.

24         Just one or two, please, Your Honor.  Can I do it

25   from here?

1        **THE COURT:**  Yes.  As long as we get you on the mic.

2        **MR. SCHWARTZ:**  Okay.

3                    <u>**RECROSS EXAMINATION**</u>

4   **BY MR. SCHWARTZ:**

5   Q.   We've gone through a lot of stuff.  I just want to make

6   sure I've got a few things clear.  You did -- and I think you

7   said this on my cross-exam.  You didn't include all of the

8   comments made that you attribute to Mr. Thilges in your

9   warrant application affidavit; right?

10  A.   Correct.

11  Q.   Okay.  And you would also agree that many, if not all

12  these comments -- no, no -- many of these comments had what

13  appears to be a far right, sort of, political slant; correct?

14  A.   Yes.

15  Q.   Okay.  And that many of these comments, without

16  getting into -- we don't have to go through every single one

17  of them -- were clearly politically motivated rants?

18  A.   I believe they were threats of violence.

19  Q.   Politically motivated ones, though; fair to say?  Most of

20  them?

21  A.   Potentially.

22  Q.   Okay.  I mean, it wouldn't be crazy to assume that after

23  looking at all of them?

24  A.   Based on his posts, he also made comments about

25  censorship which is, I believe, why he was targeting Google

 1  and YouTube and Twitter for censorship issues.

 2  Q.   And didn't any -- the post called a lot of those social

 3  media platforms -- or associated them with democrats; right?

 4  You saw that?

 5  A.   They were threats of violence towards democrats.

 6  Q.   Okay.  Thank you.

 7          **MR. SCHWARTZ:**  Thank you, Your Honor.  No more

 8  questions.  Thanks.

 9          **THE COURT:**  May the witness be excused?

10          **MS. LANG:**  Yes, Your Honor.

11          **THE COURT:**  All right.  Agent Storm, you're excused.

12  Thank you very much for coming and good luck at Honolulu.

13  Sounds like a rough assignment, so...

14          **THE WITNESS:**  Thank you, Your Honor.

15          **MS. LANG:**  At this time, the Government calls

16  Greg Marx to the stand.

17          **(Witness sworn.)**

18          **MS. LANG:**  Mr. Schwartz, he's the case agent, so I

19  was going to have him stay in the courtroom.  Thanks.

20          **THE COURT:**  You may proceed.

21          **MS. LANG:**  Thank you, Your Honor.

22

23

24

25

*Evidentiary Hearing*                                                           84

1                                **GREGORY MARX,**

2   **Having Been First Duly Sworn, Was Examined and Testified As**

3   **Follows:**

4                              **DIRECT EXAMINATION**

5   **BY MS. LANG:**

6   Q.   Please state your name.

7   A.   Special Agent Gregory Marx.

8   Q.   And what is your occupation?

9   A.   I'm an agent with the FBI.

10  Q.   And how long have you been with the FBI?

11  A.   I've been an agent with the FBI for approximately

12  15 years.

13  Q.   And what area within the FBI are you currently assigned

14  to or what type of crimes do you investigate right now?

15  A.   I'm currently working Crimes Against Children matters and

16  I've worked Crimes Against Children for a total of a little

17  over 5 years in my career.

18  Q.   Do you have any -- since you've been doing that for about

19  5 years, have you -- do you have any particular training or

20  experience dealing with just child exploitation crimes?

21  A.   Yes, I do.

22  Q.   Did you become involved in an investigation into Matthew

23  Thilges in October of 2020?

24  A.   I did.

25  Q.   And how did you become involved in the investigation?

1    A.    Special Agent Storm had conducted a search warrant and he

2    approached myself and another agent on my squad and informed

3    us that he had been executing that search warrant by way of

4    examining the first device of several devices that he obtained

5    that warrant for.  And in doing so, he came across some

6    concerning images and he wanted us to take a look at those

7    images and just give our opinion about what we thought about

8    them.

9    Q.    And did you -- did you do that?

10   A.    I did.  Yes.

11          **MS. LANG:**  Your Honor, may I approach?

12          **THE COURT:**  Yes.

13   **Q.    (By Ms. Lang)** Agent Marx, I've just handed you exhibits

14   that have been previously admitted as Government's 6a through

15   6e.  Were those the images that Agent Storm showed you back in

16   October of 2020?

17   A.    They were.  Yes.

18   Q.    And Agent Storm has already described them for the

19   record.  But at some point in time, did you draft a search

20   warrant to examine devices further?

21   A.    I did.  Yes.

22   Q.    And what was the point of that search warrant?

23   A.    The point of that search warrant was to search for

24   additional evidence of production of child pornography.

25          **MS. LANG:**  Your Honor, may I approach?

1           **THE COURT:**  You may.

2    **Q.    (By Ms. Lang)** And, Agent Marx, I'm handing you what's

3    been marked as Exhibit 2.  Do you recognize that?

4    A.    I do.

5    Q.    And what is it?

6    A.    It is a search and seizure warrant pertaining to

7    Mr. Thilges' devices.

8    Q.    And did you draft the application for that?

9    A.    I did.  Yes.

10   Q.    And did you present that to a magistrate judge here in

11   St. Louis?

12   A.    I did.

13   Q.    And what date did you present it to Magistrate

14   Bodenhausen?

15   A.    It was October 22nd of 2020.

16   Q.    And was there anything that you told or explained to

17   Magistrate Bodenhausen that you did not put in the affidavit

18   or the application of the search warrant?  Was there any

19   outside information that you believe he relied on?

20   A.    None that I can recall.

21   Q.    And did he then sign the warrant for the child -- for any

22   additional child pornography located on the devices?

23   A.    He did.  Yes.

24   Q.    And then did you do a forensic exam of the devices seized

25   from the Thilges residence?

1    A.    I did.

2    Q.    Did you locate any child pornography images?

3    A.    I did.  I located about, I would say, over 7,000 images

4    of child pornography on a laptop that was attributed to

5    Mr. Thilges.

6    Q.    Did you find any other images outside of those on the

7    Samsung cell phone attributed to the defendant?

8    A.    On the Samsung cell phone, there were some concerning

9    images of a 6- to 8-year-old girl, yes, that we located as

10   well.

11   Q.    And the images that have -- in 6a through 6e, did you

12   describe those in your affidavit?

13   A.    I did.  Yes.

14   Q.    Okay.  And that's what was relied upon for the further

15   search for child pornography; correct?

16   A.    That's correct.

17            **MS. LANG:**  I don't have anything further,

18   Your Honor.

19            **THE COURT:**  Cross-examination.

20            **MR. SCHWARTZ:**  Thank you.

21                         **CROSS-EXAMINATION**

22   **BY MR. SCHWARTZ:**

23   Q.    Good morning, Agent Marx.

24   A.    Good morning.

25   Q.    You didn't have any involvement in the original

1    investigation that Agent Storm was conducting; is that right?

2    A.   I had no involvement in that part.

3    Q.   All right.  So your involvement was limited to when

4    Agent Storm brought to you what the Government just referred

5    to as Exhibits 6 --

6              **MS. LANG:**  I left them up on the front.  They're

7    with the witness.

8              **MR. SCHWARTZ:**  May I approach the witness,

9    Your Honor?

10             **THE COURT:**  You may.

11             **MR. SCHWARTZ:**  Thank you.

12   **Q.   (By Mr. Schwartz)** Your involvement in this case was

13   limited to when Agent Storm came to you and showed you what

14   the Government just showed you, Exhibits 6a, b, c, d, and e;

15   is that accurate?

16   A.   Not entirely.  I mean, from that point forward, that

17   particular aspect, everything that followed from that search

18   warrant was handled by myself and my squad.

19   Q.   Thank you.  Okay.  So let me just talk about the search

20   warrant though.

21   A.   Okay.

22   Q.   So the information -- the photos, the images contained in

23   6a through 6e, that's all the knowledge you had in terms of

24   what you put in the search warrant application to then go and

25   conduct an exam of all the other electronics that you

1    mentioned; is that accurate?

2    A.    Not entirely.  No.  So there were the images, but then

3    there were some additional contextual information that I

4    obtained from Special Agent Storm that resulted from things

5    that he saw and things that were photographed in Mr. Thilges'

6    residence.

7    Q.    And the contextual information, would that be,

8    essentially, information that went towards the identity of

9    this little girl in Exhibit 6?

10   A.    That was part of it.  Yes.  So identifying that those

11   images were actually taken in his residence was something that

12   I did through examining the photos that were taken during the

13   search warrant and comparing the furniture in there and things

14   like that to confirm that they were, in fact, taken in his

15   residence.

16   Q.    All right.  And you also learned from Agent Storm, did

17   you, that this child was likely the granddaughter of

18   Mr. Thilges' girlfriend?

19   A.    I did.  Yes.  That played into the overall context of

20   obtaining the search warrant.  Yes.

21   Q.    Did Agent Storm also inform you of the fact that that

22   girlfriend spent a lot of time at the house, as did children?

23   A.    Yes.

24   Q.    Okay.  Now let's just look at the search -- I want to ask

25   you some questions about the search warrant application --

1    A.    Okay.

2    Q.    -- itself.  Okay?  So the information that you include in

3    your affidavit in support of your application for a search

4    warrant --

5              **THE COURT:**  Mr. Schwartz, Exhibit 2 hasn't been

6    admitted into evidence yet.

7              **MR. SCHWARTZ:**  I would not object to the Government

8    moving to admit that.

9              **MS. LANG:**  I'll so move now, Your Honor.

10              **MR. SCHWARTZ:**  And there's no objection to that.

11              **THE COURT:**  Exhibit 2 will be admitted into

12    evidence.

13              **MR. SCHWARTZ:**  Thank you.

14    **Q.    (By Mr. Schwartz)** With regard to your affidavit,

15    Agent Marx, you generally referred to the original

16    investigation that sort of got you to the discovery of the

17    images; right?

18    A.    Correct.  We provided some background on how we got to

19    where we were.

20    Q.    Some context; fair to say?

21    A.    Correct.

22    Q.    And then you referenced a -- some sort of doll; correct?

23    A.    That's correct.

24    Q.    You never saw this doll physically though; correct?

25    A.    I never saw it in person.  I saw it on the search warrant

1    photos.

2    Q.    And it's referenced as a child-like sex doll; correct?

3    A.    That's correct.

4    Q.    And what -- what knowledge did you have to arrive at that

5    conclusion?

6    A.    Well, the knowledge was based on talking to several

7    people that had participated in the search warrant and saying

8    that that doll was, anatomically speaking, consistent with a

9    sex toy.

10   Q.    So what -- I'm going to have to ask you to be a little

11   more specific.  Right?  So --

12   A.    In particular, I was told by one of the agents that was

13   on the scene, that in looking at that doll, there was an

14   actual opening to the vagina and vulva and everything.  There

15   was -- you know, it appeared to be -- it had been designed for

16   the purpose of being a sex doll.

17   Q.    All right.  And the size of it?  How big was it?

18   A.    Based on what I -- the information I obtained from other

19   people, and looking at the photograph and comparing that to

20   things around it, I would have estimated it to be somewhere

21   around 3 1/2 to 4 feet tall potentially.

22   Q.    Did anybody measure it that you know of and tell you how

23   big it was?

24   A.    No.  No.  Like I said, I spoke to people there and then I

25   gauged from the photographs with other common items that

1   appeared in the photographs to come up with an approximate

2   size.

3   Q.   So I can only imagine that there's a wide variety of sex

4   dolls out there on the market.  Is that an accurate statement?

5   A.   I'm not sure, but that's probably a fair thing to say.

6   Q.   Okay.  And is it also -- sorry.

7          **MR. SCHWARTZ:**  Can I have a second, Your Honor?

8          **THE COURT:**  Yes.

9   **Q.   (By Mr. Schwartz)** So let me show you, if I could

10  approach, Your Honor, what's been marked as Exhibit No. 8.

11  May I -- or is it up there, the picture of the doll?

12  A.   It is not.

13         **MR. SCHWARTZ:**  May I approach, Your Honor?

14         **THE COURT:**  You may approach.

15  **Q.   (By Mr. Schwartz)** Are you looking at Exhibit 8?

16  A.   I am.

17  Q.   Do you understand that to be the picture of the doll that

18  you reference in your affidavit?

19  A.   I do.

20  Q.   All right.  You said you thought it was -- I forgot what

21  you said -- 3 1/2 feet?  What'd you say?

22  A.   Roughly 3 1/2, 4 feet tall.

23  Q.   Okay.  3 1/2, 4 feet tall.  And somebody told you that

24  there was a hole where the vagina would be?

25  A.   That's correct.

1    Q.    Okay.

2    A.    Yes.

3    Q.    And it's bald; right?  There's no hair on the head of

4    that thing?

5    A.    There was a wig that was there, but, yeah, there's no

6    hair actually there.  There was a wig right next to it.

7    Q.    There's no wig on the doll in Exhibit 8 though, is there?

8    A.    No.  It's laying right next to it.

9    Q.    Okay.  I didn't see it.  And so there's no -- you're not

10   aware of any packaging or anything that said "child sex doll"

11   or anything; right?

12   A.    I am not.

13   Q.    Okay.  There's no -- well, so the doll pictured in

14   Exhibit 8 appears to have some breasts?  Yeah?

15   A.    You could say that.  Yes.

16   Q.    Well, I want you to say it.

17   A.    I would say, as I described it in the search warrant,

18   that it was -- it would appear to me to be underdeveloped

19   breasts.

20   Q.    Okay.  This is almost a ridiculous conversation, but

21   unfortunately, it sort of matters here.  So this particular

22   doll, there's nothing about this doll that would necessarily

23   separate it from some small 18-year-old necessarily; right?

24   Is there any -- let me withdraw that question.

25   A.    I'm not sure I understand your question.

1   Q.   Is there any one thing about this doll that you can look

2   at it and say, This is obviously a child doll?

3   A.   One thing, no, not necessarily, but the assessment was

4   based on numerous things as described in that search warrant.

5   Q.   But you don't have any experience with child-like sex

6   dolls in your work; is that right?

7   A.   No.  But, unfortunately, in working Crimes Against

8   Children, I have seen millions of images of child pornography

9   so I do have that context to compare it against as well.

10  Q.   I understand.  So is it your testimony that you've never

11  seen a quote-unquote child-like sex doll?

12  A.   I have actually seen them before.

13  Q.   Before this incident?

14  A.   Yes.

15  Q.   Okay.  And so I guess my question was there's really no

16  way to separate this doll or to identify this doll's age?  I

17  know that sounds crazy.  Or the way it -- the age it looked to

18  be.  Is that fair?

19  A.   That's fair.  Yeah.

20  Q.   Okay.  I mean, there are really short female adults;

21  right?

22  A.   That's correct.

23  Q.   There are tiny female adults?

24  A.   There are.

25          **MS. LANG:**  Objection.  Asked and answered.

1          **MR. SCHWARTZ:**  Sorry.

2          **THE COURT:**  I'll overrule.

3    **Q.    (By Mr. Schwartz)** And there are adult females with small

4    breasts?

5    A.    That's true.

6    Q.    Okay.  So you include reference to that.  Before you went

7    and got the search warrant, did you speak with Mr. Thilges?

8    A.    I did not.  No.  He was interviewed by Special Agent

9    Storm.

10   Q.    So is it fair to say that pertaining to the doll, you had

11   no other information other than, essentially, what we can see

12   in Exhibit 8?

13   A.    No, not necessarily.  I had contextual information which

14   the search warrant was based on.  It was not based on one item

15   such as the doll or one photograph.  It was based on the

16   totality of things together.

17   Q.    I know.  I mean, just as to the doll, you didn't have any

18   more information other than what you just saw in the picture?

19   A.    No.

20   Q.    As to the doll itself.  Not to the warrant application as

21   a whole.

22   A.    No.

23   Q.    Okay.  And then let's talk about the photos that are

24   contained in 6a, b, and c.  You -- you didn't extract these

25   from the phone.  This was done by Agent Storm or one of his

 1    people?

 2    A.    So I extracted them from the device when I did my

 3    forensic examination, but, initially, they were located by

 4    Special Agent Storm as part of his search warrant.

 5    Q.    So let's talk about what you used though for the

 6    application for your search warrant, because I understand

 7    that, ultimately, you got a search warrant and then you did a

 8    deep dive into that device.  But I want to talk about what you

 9    were utilizing when you applied for the warrant.  Okay?

10    A.    Correct.

11    Q.    And so those images, those were extracted by Agent Storm?

12    A.    Yes.

13    Q.    Or someone on his team?

14    A.    Yes.

15    Q.    Okay.  And how did you view them?  Were they on the phone

16    when you looked at them?  Were they printed?

17    A.    So when we do forensic examinations, we have software

18    that we use to actually view the artifacts on the device and

19    Special Agent Storm actually showed us those artifacts that

20    were extracted from the device.

21    Q.    On a computer screen?

22    A.    Yes.

23    Q.    Okay.  And that's Exhibit 6a through d?  Those are fair

24    and accurate depictions of what you saw on that computer

25    screen that day?

1  A.   Yes.

2  Q.   Okay.  Did you show these photos to the magistrate when

3  you applied or did you just use the descriptions that you put

4  in the affidavit?

5  A.   We don't typically show images like that, so no.

6  Q.   Fair enough.  Do you know whether or not the child in 6e

7  is the same child pictured in a through d?  Did you know, I

8  should say, at the time that you applied?

9  A.   We believed it was.  Yes.

10  Q.   And I should -- maybe I should clarify for you.  6e, I

11  believe, is the photo of the child holding what looks to be a

12  rifle?

13  A.   Yeah.  I wasn't sure, but we believed it could be.

14  Q.   All right.  Okay.  So your investigations focus on child

15  exploitation, sexual exploitation?

16  A.   Yes, sir.

17  Q.   Okay.  And so you're familiar with what constitutes child

18  sexual exploitive material?

19  A.   Yes.

20  Q.   What I generally call child pornography?

21  A.   Yes.

22  Q.   Okay.  And, generally speaking, I'm not going to go

23  through all of the, sort of, hallmarks or the element, but

24  primarily, you would agree that child pornography is going to

25  contain some sort of exhibition of the genitals of a minor;

1  right?

2  A.   Generally speaking, it would be lascivious exhibition of

3  the genitals or a minor engaging in some sex act.

4  Q.   Fair enough.  And we can agree that the exhibits that you

5  describe in the affidavit don't contain any images of a minor

6  involved in a sex act; right?

7  A.   That's correct.

8  Q.   Okay.  And we can also agree that the photos contained in

9  6a through d don't contain or show a demonstration of

10  genitals; right?

11  A.   That's correct.

12  Q.   And not in any way, shape, or form, lascivious or

13  otherwise; correct?

14  A.   Correct.

15  Q.   But you would agree that some parents take that

16  occasional picture of their little kid in a complete state of

17  undress which sometimes might contain genitals; right?

18  A.   I have seen that in my investigations.  Yes.

19  Q.   Yeah.  And you wouldn't argue with the fact that

20  sometimes those pictures are not child pornography.  They're

21  just parents taking a picture of their kid in the bathtub or

22  whatever where you can see the genitals; fair?

23  A.   I wouldn't agree with that all the time.

24  Q.   So my question is that every picture of a minor with

25  their genitals in view doesn't constitute child porn in your

1   understanding, does it?

2   A.   That's true.  Yes.

3   Q.   That's what I meant.  So the occasional picture of a kid

4   taken by his parent who's peeing in the backyard, for lack of

5   a better example, that's not necessarily child pornography;

6   right?

7   A.   That's true.  It depends on the image and it depends on

8   other contextual things.

9   Q.   Absolutely.  So you get to this potential that this is a

10  lewd and lascivious sort of demonstration; right?

11  A.   I'm sorry?

12  Q.   To get to the lascivious nature --

13  A.   Correct.  Yes.

14  Q.   -- of the quote-unquote demonstration of the genitals;

15  right?

16  A.   Yes.

17  Q.   Okay.  So we can also agree that in the exhibits that you

18  described in the affidavit, in addition to there not being any

19  content of sexual activity nor any demonstration of genitals

20  at all, there's not even any demonstration of breasts or

21  areolas of any sort; correct?

22  A.   That's absolutely correct.

23  Q.   Okay.  The gun image, 6e, that's just not relevant to

24  this inquiry.  Is that fair to say?

25  A.   I disagree.

1    Q.    And how would this be relevant towards a CSAM

2    investigation, a child porn investigation?

3    A.    So the reason I included that was for the context of

4    identifying who that girl was and what she was doing in that

5    residence, what her comfort level was in the residence, what

6    types of activities that she was engaging in, in the

7    residence.  And Special Agent Storm had told me that it was

8    not Mr. Thilges' daughter.  It was his girlfriend's, I

9    believe, granddaughter.  And so, yes, I found it to be

10   relevant just to help understand the types of things that she

11   was doing in the residence.

12   Q.    Okay.  You had never made any attempt to speak with this

13   child before you presented your affidavit in your search

14   warrant application?

15   A.    No.  It would not have made investigative sense at that

16   point.

17   Q.    You testified earlier that these images that the

18   Government went through with you contained in Exhibit 6 were

19   concerning; right?

20   A.    Yes.

21   Q.    That was the word you used, wasn't it?

22   A.    That's one word that I would use.

23   Q.    That's the word you used today; right?

24   A.    Yes.

25   Q.    Okay.  And you've also testified that these images do not

1   contain child pornography in your professional opinion; right?

2   A.   Correct.

3   Q.   Okay.  You presented -- presented an application for a

4   search warrant, an affidavit, to a magistrate, and -- claiming

5   that Mr. Thilges had attempted to commit the crime of

6   production of child pornography; right?

7   A.   Attempted production of child pornography.  Yes.

8   Q.   Yeah.  And the evidence that you presented to the Court

9   in that application, your affidavit, included what we

10  originally said which was the original investigation for

11  contextual purposes; right?

12  A.   Correct.

13  Q.   Okay.  The doll; correct?

14  A.   Correct.

15  Q.   The doll?

16  A.   Yes.

17         **MR. SCHWARTZ:**  May I approach the witness,

18  Your Honor, again and look at the exhibit?

19         **THE COURT:**  You may.

20         **MR. SCHWARTZ:**  Okay.

21  **Q.   (By Mr. Schwartz)** You also told the magistrate in your

22  affidavit that that doll had a child-like face, did you?

23  A.   Yes.

24  Q.   And if you would, state with specificity what features of

25  that doll's face that you claim were child-like.

1  A.   It's just based on a visual norm that most people would

2  have of looking at an adult face versus a child face.  I don't

3  know that I could nail it down to specific anatomical

4  features.  But it's just a general sense when you see that

5  people -- that any, you know, person would have of a child's

6  face versus an adult's face.  And especially in my instance,

7  having looked at many children in previous investigations.

8  Q.   It's a plastic doll; right?

9  A.   That's correct.  Yes.

10  Q.   And does it appear -- it has eyes of some sort, plastic

11  eyes; right?

12  A.   It does.

13  Q.   And it looks like they have makeup on, kind of, doesn't

14  it?

15  A.   I'm not really --

16  Q.   It's kind of dark around the eyes, aren't they?

17  A.   I'm not really certain of that.

18  Q.   Okay.  But, again, that picture, you didn't show to the

19  magistrate either; correct?

20  A.   It was not.  No.

21  Q.   You could have --

22  A.   We don't typically show images as part of a search

23  warrant application.  We describe them.

24  Q.   Because, typically, those images contain child

25  pornography.  Fair to say?

1    A.    In some circumstances, yes.

2    Q.    In most; right?

3    A.    Not necessarily most.

4    Q.    Okay.  But you could have attached the doll image had you

5    chosen to; right?

6    A.    I suppose.

7    Q.    Okay.  So your decision, though, was not to?

8    A.    It was something that I did not do based on the norms of

9    what we typically do.

10   Q.    Okay.  Then also in your affidavit, you obviously include

11   descriptions of the photos; right?

12   A.    That's correct.

13   Q.    Okay.  What other evidence, if any, did you present to

14   the magistrate in support of your position that you'd probably

15   find evidence of a crime if you went to this place and

16   searched?

17   A.    I'm sorry.  Can you repeat the question?

18   Q.    You need probable cause to get a search warrant; right?

19   A.    That's correct.

20   Q.    Okay.  You went to a judge and you said, Here's the

21   probable cause, in your affidavit.  That's what you said;

22   right?

23   A.    Yes.

24   Q.    Okay.  And you told him about the guns in that

25   investigation; right?

1    A.   That's correct.

2    Q.   And you told him about the doll; correct?

3    A.   That's correct.

4    Q.   Okay.  Although that doll was never pictured in any

5    photos with the young girl; right?

6    A.   It was not.

7    Q.   Okay.  And you told him about the pictures; right?  6b,

8    c, d?

9    A.   Yes.

10   Q.   Okay.  You told him that the pictures -- essentially, you

11   told him that those pictures were not child pornography;

12   right?

13   A.   Yes.  They are not child pornography.

14   Q.   Okay.  That's all you told him, right, in your affidavit?

15   That's it?

16   A.   There was some additional context that was in there as

17   well.  It's extremely important to our application.

18   Q.   Well --

19   A.   Coming to the conclusion that there may have been -- or

20   that there was probable cause to believe that an attempt was

21   made to produce child pornography.

22   Q.   Okay.  So that's the question here.  Right?  So what

23   additional information did you provide the magistrate that

24   would indicate that more probably than not Mr. Thilges was

25   attempting to produce child pornography?

1    A.   So I think it was contextual information that was

2    contained in the descriptions of the child pornography and I

3    can explain to you from those descriptions the apparent

4    relevance of it to the search warrant.

5    Q.   Do you know if the child in these pictures was asleep or

6    awake?  You don't know that; right?

7    A.   Appeared to me to be asleep.

8    Q.   Why is that?  Eyes closed?

9    A.   Because she was laying in positions that someone might be

10   laying in when they're sleeping.  I don't recall,

11   specifically, if her eyes was closed -- were closed.  But it

12   certainly appeared that she was sleeping.

13   Q.   Okay.  All right.  So let's just look at, I guess, 6b.

14   Do you remember what 6b was?

15   A.   Yeah.  May I see the images again?

16   Q.   Can you see them from here or do you want me to come up

17   there?

18   A.   I cannot from here.  I'm sorry.

19          **MR. SCHWARTZ:**  May I approach, Your Honor?

20          **THE COURT:**  You may.

21   **Q.   (By Mr. Schwartz)** What is it about 6b that causes you to

22   think that the production of child pornography was being

23   attempted?

24   A.   So the -- this particular image, her pants are pulled

25   down or they are down, exposing her entire buttocks.  I feel

1    like she's positioned in that context unnaturally and somewhat

2    awkwardly.  And looking at this, and having looked at a lot of

3    images in a lot of investigations, it seemed to me that it's

4    unlikely that a child's pants would have slipped down in this

5    manner on several occasions.

6            And the reason I know it was several occasions was

7    because the three images that we included in the search

8    warrant affidavit showed her buttocks, I believe, in two of

9    them, pants pulled down in a similar manner.  And her pelvic

10   area with the only thing blocking her genitals being a blanket

11   that was blocking it based on the angle of the camera.  And

12   she was wearing different clothes in all three of those

13   images.  So that means those images were likely taken on

14   different dates.

15           So from a contextual standpoint, would a parent

16   possibly take a picture of a child as an, Oh, look, her butt

17   crack is showing and she's sleeping and it's cute and we want

18   to show her when she gets up?  Yeah.  I can see that

19   happening.  Would that happen on three different occasions in

20   a similar manner where her entire buttocks and her entire

21   pelvic area is exposed, I think that's unlikely.

22           Also, these images were found on Mr. Thilges' phone.

23   This is not his daughter or granddaughter.  It's his

24   girlfriend's granddaughter.  And the images being found on a

25   phone that was controlled by him seemed particularly

1    concerning because it was not a parent taking these images.

2    Q.    Okay.  So contextually -- that's a word that you're using

3    a lot.

4    A.    Yes.

5    Q.    When you applied for the affidavit, you knew from

6    Agent Storm that there were many, many, many other photos of

7    the child on Mr. Thilges' phone; right?

8    A.    Yes.  That was another thing that actually played into

9    the overall context and was noted in the search warrant.  So

10   there were many images of that girl who I estimated to be 6 to

11   8 years old on his device.  In fact, there were almost, if I

12   can recall, more images of her apparently sleeping in

13   unnatural positions than there were of her awake.  And so I

14   thought that was extremely odd.

15   Q.    But there were also many, many, many images of perfectly

16   appropriate pictures of this child on the phone; right?

17   A.    There were images that were normal images.

18   Q.    Hundreds?

19   A.    But I have never seen in my investigations someone take

20   so many images of a child on different occasions sleeping and

21   positioned in that manner and photographed with indecent

22   exposure in that way.  And so it appeared to me, based on my

23   training and experience, that Mr. Thilges was attempting to

24   produce images of child pornography.  And I can tell you from

25   my investigative experience for some subjects that I have

1   investigated who are interested in child pornography and

2   sexually interested in children, there is a continuum for some

3   of them, if you will, in terms of how they get to the point

4   where they go hands-on with a child.  And a lot of times, that

5   starts with something innocuous that that subject can

6   reasonably try to explain away.  And the reason they might do

7   that is because they're afraid of getting in trouble or they

8   might be afraid that the child would be alarmed by the

9   activity and might report that activity.

10          So what I've seen in prior cases is that a subject,

11  in some circumstances, as he's progressing to hands-on

12  offenses with a child, or production of child pornography,

13  might progress in the kind of way taking the kind of images

14  that we saw in this photo.

15  Q.   Fair enough.  So we're talking about this continuum of

16  where an individual may go from legal behavior to what you

17  believe to maybe be hands-on child sexual exploitation; right?

18  A.   Yes.

19  Q.   Okay.  And so when you saw this stuff and you looked at

20  the context, your hunch was that he was somewhere on that

21  continuum; fair to say?

22  A.   Yeah.  My belief was that he was at the point where he

23  was trying to start producing some images of child

24  pornography; and thus, the attempted child pornography that we

25  cited in the search warrant application.

1    Q.   So your -- how long have you been investigating these

2    cases?  I know you've been an agent for 15 years.

3    A.   15 years.  Over 5 years, I've worked Crimes Against

4    Children.

5    Q.   And you've obviously worked a lot of these cases?

6    A.   I have.

7    Q.   You've seen this continuum; right?

8    A.   Not in all cases because not all subjects are hands on.

9    Q.   Sure.

10   A.   But in some cases, yes.

11   Q.   Right.  And so my question was, when you looked at this,

12   you knew what you saw in terms of this continuum potentially;

13   right?  That was your thought; right?

14   A.   I'm not sure what you're asking.

15   Q.   Well, you saw -- you saw pictures that were perfectly

16   legal; correct?

17   A.   I saw pictures that appeared to me to be an attempt to

18   produce child pornography.

19   Q.   Okay.  So this is where you've got to answer the

20   question.  You saw photos, Exhibit 6, that were perfectly

21   legal; right?

22              **MS. LANG:**  Objection.  Asked and answered.

23              **MR. SCHWARTZ:**  Well, I'm trying.  He hasn't -- he

24   already testified that those pictures were legal.  I'm trying

25   to simply establish what he said to then ask the next

*Evidentiary Hearing*                                                110

```
 1   question.
 2           MS. LANG:  Objection.  That is not what he testified
 3   to.
 4           THE COURT:  I'll sustain the objection.  He did
 5   answer your question.  You can ask a different question if you
 6   like.
 7           MR. SCHWARTZ:  Thank you.
 8   Q.   (By Mr. Schwartz) You admitted earlier that Exhibit 6a
 9   through d are, on their face, not containing what would be
10   defined by your understanding and your training as child
11   pornography; right?
12   A.   Yes.
13   Q.   We've established that.  Okay.
14           And then you --
15   A.   By themselves, that's correct.
16   Q.   By themselves.  Right.  And at that time, that and the
17   context other than what you -- that, and what you set out in
18   the affidavit, that's all the context you had, obviously.  You
19   put it in the affidavit; right?
20   A.   That's correct.
21   Q.   And you've testified to what that context is; right?
22   A.   Yes.
23   Q.   Okay.  There's nothing in your affidavit that indicates
24   that Mr. Thilges intended to create or produce child
25   pornography; right?  You -- you -- correct?  Other than the
```

1   facts that you claim mean that, in your opinion; right?

2            **MS. LANG:**  Objection.  Compound question.

3            **MR. SCHWARTZ:**  I'll rephrase that question.  Yeah.

4            **THE COURT:**  You may rephrase the question.

5            **MR. SCHWARTZ:**  Thank you.  Okay.

6   **Q.    (By Mr. Schwartz)** The photos and the other contextual

7   information is all you gave to the judge; right?

8   A.    Yes.

9   Q.    Okay.  And based on your experience, you felt as though

10  Mr. Thilges was on that continuum of where he may make these

11  pictures that were referred to in Exhibit 6, and then at some

12  point, transition to hands on or something illegal; right?

13  A.    I wasn't sure if he would transition to hands on at some

14  point.  His end-stop may have been just to produce images,

15  which it is in some circumstances.

16  Q.    Absolutely.  And your testimony is that based on what you

17  viewed and what you knew at the moment you signed off on that

18  affidavit, that he might go down that road; right?

19  A.    Yes.

20  Q.    Okay.

21            **MR. SCHWARTZ:**  One second, please, Your Honor.

22            Your Honor, Mr. Thilges has indicated to me that he

23  would like to ask the witness questions.  I told him I would

24  tell you of that request.

25            **MS. LANG:**  Objection, Your Honor.  This is not a

 1   hybrid representation.  He has Mr. Schwartz.  He cannot ask

 2   his own questions.  He has an attorney.

 3            **THE COURT:**  Mr. Schwartz, you can ask a question on

 4   his behalf if you'd like.

 5            **MR. SCHWARTZ:**  Let me see if he's got one for me,

 6   please.

 7            A couple more if I might.

 8            **THE COURT:**  You may proceed.

 9   **Q.    (By Mr. Schwartz)** Just for more context in terms of the

10   relationship between Mr. Thilges and this child.  I think you

11   did say that you were aware of the fact that this was the

12   grandchild of Mr. Thilges' girlfriend; right?

13   A.    That's correct.

14   Q.    And you -- I think you were also aware of -- and I might

15   be mixing up my questions with you that I had with Agent

16   Storm.  But I think you were also aware of the fact that the

17   grandmother spent a fair amount of time over there with

18   Mr. Thilges?

19   A.    Yes.  I was aware of that.

20   Q.    Okay.  And you were also aware of the fact that the

21   grandchild did as well?

22   A.    Yes.

23   Q.    All right.  You didn't have any indication that the

24   grandchild ever spent time alone with Mr. Thilges; correct?

25   A.    I had no specific information.  No.

```
 1   Q.    One way or the other?

 2   A.    No.

 3   Q.    Okay.  So you don't know if Mr. Thilges -- if

 4   Mr. Thilges' girlfriend was present when these photos in

 5   Exhibit 6 were taken or not; right?

 6   A.    I don't know that.

 7   Q.    Okay.  And for that matter, you don't know whether or not

 8   Mr. Thilges' girlfriend took those photos with that phone;

 9   correct?

10   A.    True.

11            MR. SCHWARTZ:  Okay.  No more questions, Your Honor.

12   Thank you.

13            THE COURT:  All right.  Redirect?

14            MS. LANG:  Yes, Your Honor.

15            THE COURT:  Oh, before we get to redirect.

16   Mr. Schwartz, are we going to offer Exhibit 8 or was it just

17   for demonstration purposes?

18            MS. LANG:  I think, 8, I admitted with Agent Storm.

19            THE COURT:  Did we do 8?

20            THE CLERK:  Yes, Judge.  Okay.  8's been admitted.

21            THE COURT:  Okay.  Then I'll withdraw my questions.

22            MS. LANG:  Your Honor, may I approach?

23            THE COURT:  You may.

24

25
```

1              **REDIRECT EXAMINATION**

2    **BY MS. LANG:**

3    Q.    Agent Marx, I'm going to direct your attention to 6a

4    that's been admitted.

5    A.    Okay.

6    Q.    When you look at that picture, had the blanket not been

7    obstructing it, the genitals would have been fully viewed;

8    correct?

9    A.    That was my assessment.  Yes.

10   Q.    And the focal point of the picture is the genital area;

11   correct?

12   A.    That's the way it appears to me.  Yes.

13   Q.    The way -- especially the way the child -- the way she

14   is --

15           **MR. SCHWARTZ:**  I'm going to object to the leading

16   nature of these questions.

17           **MS. LANG:**  Okay.  I'll ask --

18           **THE COURT:**  Sorry?

19           **MS. LANG:**  I said I can rephrase it.

20           **THE COURT:**  Please rephrase the question.

21   **Q.    (By Ms. Lang)** How was the child's body positioned,

22   particularly, her pelvic area?

23   A.    She's positioned with her hands extended above her head

24   and her shirt is pulled up and the pelvic area of her body is

25   relatively central to the photograph in positioning.

1   Q.   The pelvic area is in the center.  And do you see, is her

2   underwear covering anything?

3   A.   No.  I don't see any underwear.

4   Q.   So if the blanket had not been -- had the blanket been

5   down 1 centimeter, would her genitals have been visible in

6   that picture?

7   A.   I believe so.  Yes.

8   Q.   And going to 6b and c, similarly, could you describe how

9   the genitals are covered in those two pictures?

10  A.   So b is her pants are pulled down exposing her entire

11  buttocks.  So you cannot see, from the angle that the picture

12  was taken, her genitals.  However, her genitals would have

13  been, obviously, visible from a different angle.

14  Q.   And what is the focal point of that picture, in your

15  opinion?

16  A.   The focal point of that picture, in my opinion, is her

17  buttocks.

18  Q.   And same question for 6c.  What's the focal point of that

19  one?

20  A.   Same for 6c.

21  Q.   And had the pants been pulled down a little bit more,

22  would she have been exposed?

23  A.   For 6c?

24  Q.   Yes.

25  A.   Yes.  If they were pulled down a little bit more.

1   Q.    Her genital area would have been exposed to the camera?

2   A.    Yes.

3   Q.    So those were attempts at taking child pornography?

4   A.    I believe they were.  Yes.

5          **MS. LANG:**  Thank you.  No further questions.

6          **THE COURT:**  Mr. Schwartz, do you have anything

7   further?

8          **MR. SCHWARTZ:**  Just briefly, Your Honor.

9                    <u>**RECROSS EXAMINATION**</u>

10  BY MR. SCHWARTZ:

11  Q.    All of those questions about those images, if the pants

12  hadn't been where they were, if the blanket or whatever hadn't

13  been where it was, my question is, in none of these pictures

14  can you see the genitals; correct?

15  A.    Correct.

16  Q.    All right.  So it's not like it would have been or could

17  have been.  The answer here is none of them were -- none of

18  those pictures showed genitals; right?

19  A.    That's correct.

20  Q.    All right.

21          **MR. SCHWARTZ:**  Thank you.  No other questions.

22          **THE COURT:**  All right.  Anything further from the

23  United States?

24          **MS. LANG:**  No, Your Honor.

25          **THE COURT:**  May I see the photographs of the

1    pictures, please?

2              **THE WITNESS:**  Yes.  This one as well?

3              **THE COURT:**  Yes.

4              All right.  Agent Marx, you referred in the

5    affidavit in paragraph 11 the item you called the child-like

6    sex doll in the closet; is that correct?

7              **THE WITNESS:**  Yes.

8              **THE COURT:**  All right.  You said you have seen other

9    child-like sex dolls?

10             **THE WITNESS:**  I have.  In another investigation, I

11   have seen child-like sex dolls.  Yes.  And I have seen that

12   they're sometimes sold as that online.

13             **THE COURT:**  Did the item contained in Exhibit 8 look

14   like the child-like sex dolls you had seen before?

15             **THE WITNESS:**  Based on the picture that I saw, it

16   did.  Yes.

17             **THE COURT:**  All right.  So the picture that you saw,

18   Government's Exhibit 8, looked like other child-like dolls you

19   had seen before?

20             **THE WITNESS:**  Yes.  So we had additional pictures

21   besides that one, including some where you could zoom in from

22   different angles with close-ups and things like that too.  So,

23   yes, based on all of those images together, I believe that to

24   be a child-like sex doll.

25             **THE COURT:**  All right.  And after reviewing

1    Government -- the photographs contained in Government's

2    Exhibit 6, did you believe that there was probable cause --

3    well, did you believe there would be other photographs in the

4    documents and the computer items which had already been seized

5    by the FBI which would contain either actual photographs of

6    child pornography that the defendant had produced or other

7    items of child pornography that he would have obtained over

8    the internet?

9                  **THE WITNESS:**  Yes.

10                 **THE COURT:**  All right.  I don't have any other

11   questions.

12                 Anything further on behalf of the United States?

13                 **MS. LANG:**  No, Your Honor.

14                 **THE COURT:**  Mr. Schwartz, anything further?

15                 **MR. SCHWARTZ:**  No.  Thank you, Your Honor.

16                 **THE COURT:**  All right.  I'm going to return these to

17   the agent at this time.

18                 All right.  May the witness be excused?

19                 **MS. LANG:**  Yes, Your Honor.

20                 **THE COURT:**  All right.  Special Agent Marx, thank

21   you for coming in today.  You are excused.

22                 **THE WITNESS:**  Thank you, Your Honor.

23                 **THE COURT:**  Any further evidence on behalf of the

24   United States?

25                 **MS. LANG:**  No, Your Honor.

1          **THE COURT:**  I believe we've admitted Government's

2     Exhibits A through 8; is that correct, Deputy Shirley?

3          **THE CLERK:**  Yes.

4          **MS. LANG:**  I think I -- I had a 9 too.  But it think

5     they've all been admitted.  9a through e were pictures of

6     firearms.

7          **THE COURT:**  Yeah.  That's right.

8          **THE CLERK:**  1 through 9, yes.

9          **THE COURT:**  Okay.  1 through 9 have all been

10    admitted.

11         All right.  Anything further on behalf of the

12    United States?

13         **MS. LANG:**  No, Your Honor.

14         **THE COURT:**  Mr. Schwartz, you have the floor.

15         **MR. SCHWARTZ:**  No evidence, Your Honor.

16         **THE COURT:**  All right.  Very well.  So we will

17    conclude the evidence on this hearing.

18         Would the parties like to brief this matter any

19    further or present oral argument today?  What's your position

20    on that issue, Mr. Schwartz?

21         **MR. SCHWARTZ:**  Your Honor, I don't think further

22    briefing is necessary.  I would like to make brief argument

23    though.

24         **THE COURT:**  All right.  What about for the

25    United States?

1          **MS. LANG:**  I don't think any further briefing is

2     necessary at this point either.

3          **THE COURT:**  You've briefed it, like, three times

4     already; right?

5          **MS. LANG:**  I have.

6          **THE COURT:**  All right.  I'll hear from you first,

7     Mr. Schwartz.

8          **MR. SCHWARTZ:**  Thank you.

9          So, Your Honor, we've got two search warrants here,

10    obviously.  The first one which authorized the search of the

11    house which then led to the second search warrant involving

12    Agent Marx.  These sorts of online threat cases are sensitive

13    constitutionally speaking because we have to manage -- the

14    Court has to manage a balance between the First Amendment,

15    right to free speech and where does that end in terms of what

16    you say.  It's obviously the case, the law, that free speech

17    does have a limit to it.  Right?  And we know that.

18          And we also know that in these sorts of

19    investigations which generally revolve around Chapter 18,

20    Section 875 of the code, that what's necessary is what's

21    referred to generally as a true threat.  There's many

22    discussions in many cases about what a true threat is.

23          There's -- there is one, sort of, common theme

24    though.  And the case of U.S. v. *Mabie*, which I think is

25    M-A-B-I-E, and it's in -- it's in the briefing in this case.

1   Factually, it kind of sets out the standard.  But one thing

2   that's important in that case, and in the other cases that

3   you'll see when you read the briefs, is that they typically

4   refer to specific threats made to specific people in contexts

5   where, generally, these threats are plausible in terms of

6   the -- in terms of the ability for someone to actually follow

7   through.

8           *Mabie* involved a disgruntled employer -- employee

9   who then began a campaign of threats against his employer and

10  it was all in the same town, that sort of thing.  They knew

11  each other.  The defendant knew where these people lived and

12  these threats were taken very seriously, as they should have

13  been based on the context.

14          So how do we get to this determination?  And I think

15  that context is important.  We heard that word from both

16  witnesses today.  Context with regard to search warrant No. 1

17  is what's necessary for the Court that's evaluating the

18  application to determine whether this is -- whether these are

19  true threats or whether these were what's, today, become this

20  far right hyperbolic vitriolic trash talking that -- when I

21  referred with the one witness back to former President Trump's

22  first campaign, and frankly, the stuff that he posts today,

23  it's sort of -- he threatened people.  We know that.  He

24  threatened to have people do things to people in rallies and

25  all these sorts of things.

1          So we know, and the witness agreed, that after that

2    initial presidential campaign, these sorts of statements, this

3    sort of behavior which was unheard of before President Trump's

4    campaign became, it's hard to say, mainstream.  You would see

5    them all over the place, generally in these far right spaces,

6    either on TV or -- or the internet.

7          The agent didn't put all of those statements into

8    the affidavit.  Why not?  Well, he testified that they sort of

9    got more aggressive as they went.  But what's really important

10   for the context of this thing is to look at this, for a

11   magistrate to look at this warrant and say, Okay, is this a

12   real threat?  Is this a true threat?  Or is this some wacko

13   spouting off on the internet, unfortunately, not that much

14   differently from the President of the United States.

15         **THE COURT:**  Do I have to find proof beyond a

16   reasonable doubt that it is a true threat or do I just have to

17   find probable cause that the agents see something that seems

18   concerning and they want to investigate to see if this really

19   is a true threat or it's just a guy that's upset with the

20   democrats?

21         **MR. SCHWARTZ:**  Well, I think it has to be -- I

22   think, obviously, the agent has to present to the Court

23   evidence that the Court can come to a probable cause

24   conclusion in order to authorize the search.  So, no, I don't

25   think that an agent has to present you with evidence of proof

1    beyond a reasonable doubt that it's a true threat.

2           But I think in order, in this case, in one of these

3    cases that clearly involves this political realm, that they do

4    have to give the magistrate the full picture, the context, the

5    whole story.  What do we have here?  Right?  And that's what

6    didn't happen here.

7           This is not a case where an individual made threats.

8    I'm going to kill this guy because he didn't give me my tools

9    back.  That was the *Mabie* case.  I'm going to kill this person

10   because, you know, they wronged me in some way.

11          This case, these comments are all encompassed in

12   this political, sort of, context.  So that means that the

13   magistrate has to pay closer attention because when you see

14   that, we know, okay, we're talking about a balancing act

15   between true threats and the most protected speech in our

16   First Amendment analysis, political speech.

17          So it's different that we're not talking about a

18   case where somebody's just threatening the guy who ripped him

19   off because he, you know, took his car or whatever.  We're

20   talking about balancing political speech, the most protected

21   in the continuum of First Amendment analysis, against

22   potential true threats.  And that's where the problem is here

23   with the affidavit that Agent Storm presented.  I don't think

24   he presented enough of the other comments and posts so that

25   the magistrate could review and appreciate the entire context.

1          Well, I left them out because they got more

2    aggressive.  Well, okay.  But the problem is, if you look at

3    all of it, I don't think that the probable cause exists.  I

4    think you go, Yeah, this is just some guy spouting out all

5    this craziness.  Some of these comments weren't even threats.

6    I've got 6,000 rounds of ammo.  Okay.  Or 10 million rounds,

7    which we agreed were nonsense.  And other things.  If somebody

8    bangs on my window with threats of violence, I'm going to

9    shoot them.  I mean, that's -- that's not a crime in a simple

10   analysis.  Right?

11         **THE COURT:**  Would you feel differently if the person

12   actually had eight semi-automatic assault rifles --

13         **MR. SCHWARTZ:**  I don't --

14         **THE COURT:**  -- thousands of rounds of ammunition,

15   100-round drum magazines and search information on their

16   computers to get to the headquarters of Google or YouTube?

17         **MR. SCHWARTZ:**  I wouldn't necessarily.  First of

18   all, when we talk about balancing First Amendment, now we're

19   talking about balancing Second Amendment rights.  So, no, I

20   wouldn't in terms of the probable cause.  Is it relevant?

21   Sure.  Obviously.  But is it -- but you need the context.

22         **THE COURT:**  I don't think it's relevant either.  I

23   think it's an unfair question to say, Hey, look at all this

24   bad stuff on the search warrant.  Doesn't that make the search

25   warrant okay?  But it seems relevant to me on the question of

1    was there probable cause based on the information that was

2    presented to find that there's probable cause that the

3    officers could go there and search, see if there is evidence

4    of a crime of a true threat.

5           **MR. SCHWARTZ:**  But for the context.  But I

6    understand what the Court is saying.

7           **THE COURT:**  I understand there's a political nature

8    to these statements and I understand some are grandiose.  But

9    the question is, is there enough in there to say that it's

10   probable cause?  I think that's a difficult challenge that

11   you're facing in this case, Mr. Schwartz, that it -- if we

12   were having a trial and this was a case of somebody -- the

13   Government trying to prove beyond a reasonable doubt that

14   these were true threats to the CEO of Twitter and YouTube and

15   whoever the other person was, Whitmer, but, I mean, those are

16   specific threats against specific individuals which seems to

17   be the test that we're looking for, at least, if not to the

18   groups of individuals which are also specifically mentioned.

19          **MR. SCHWARTZ:**  I certainly -- although I think that

20   you'll see in the case law that context is also an important

21   aspect.  But in looking --

22          **THE COURT:**  I agree.  I agree the context is

23   relevant.  So the question in my mind is whether there's

24   probable cause to go that far, so...

25          **MR. SCHWARTZ:**  I agree.  I would cite -- there was

1    one case which is actually contained in the Government's

2    responsive memo.  It's the *Bellrichard* case.  There's a quote

3    in there referring to the values of persuasion, dialogue, and

4    free exchange of ideas.  And this is referencing political,

5    sort of, speech.  And what I would say is that -- and that

6    case is older.  What I would say is that the Trump era has

7    turned that, what typically was our standard of

8    appropriateness in political discussion on its head, and that

9    in light of that, the context is different.  But, you know,

10   that's the argument.  And we've heard the facts now.  I've

11   made the argument.  I think if you -- when you read the memos,

12   you'll -- you'll go through that and you'll come to a

13   conclusion.  So that's my argument as to the first search

14   warrant, Your Honor.

15           **THE COURT:**  All right.  Very well.

16           **MR. SCHWARTZ:**  The second one, the second search

17   warrant that Agent Marx applied for, is, I think, even equally

18   or more problematic.  So we have a phone that Agent Storm

19   extracts or see some data or some pictures, the ones that were

20   in front of the Court, Exhibit 6.  These photos are also a bit

21   out of context.

22           These are pictures of what everyone seems to think

23   is Mr. Thilges' -- one of his grandkids or his girlfriend's

24   grandkid.  Admittedly, by the testimony, not child

25   pornography.  Can't see genitals.  It's not like there was

1  some attempt.  I'm sorry.  Let me rephrase that.  There was no

2  genitals.  All this talk about, Well, if they weren't covered,

3  would you see genitals?  That's -- I think that's misguided.

4  I mean, of course, if the genitals weren't covered, you'd see

5  it.  Right?  That would be the case with any clothing,

6  whatever.  So would a picture of a person with their clothes

7  on, would that be pornography if the clothing was off?  Well,

8  yeah, maybe.  But that's not what we're talking about.

9          We're talking about a small number of pictures of

10 this kid that are maybe some would argue distasteful, but

11 distastefulness is protected by the First Amendment.  So the

12 next question is, are they -- are they child pornography?  And

13 I think we can all agree that they're not.

14          So then do those images and the one of the kid

15 holding a gun and the other information in the affidavit rise

16 to the level of probable cause to believe that there's an

17 attempt to create child pornography?  And I don't think it

18 does.

19          And here's the interesting part.  When Agent Marx

20 testified, he said something that I think kind of summed this

21 all up.  He talked about a continuum.  Now, Agent Marx has

22 seen more of these cases, probably, than any of us have.  And

23 I believe him when he says, I've seen instances where somebody

24 starts off kind of on this end of this continuum -- that was

25 his word -- and ends up down here, whether this is hands-on or

1   not debatable collection of child pornography or production,

2   whatever.

3          He knew, or at least he was pretty darn sure, that

4   when he looked at these pictures, he was like, Yeah, this

5   guy's got something going on.  Let's go look at this.  And

6   I'll credit him because, although the Court doesn't look at

7   this, he did find child pornography subsequent to that.  We're

8   aware of that.  That's the basis of this prosecution,

9   essentially.

10          But that hunch, which, of course, is the very word

11   that Justice Frankfurter used in *Terry* where he was talking

12   about the probability of things.  The hunch is great for

13   police work.  And guys like Agent Marx and Agent Storm, that's

14   great stuff.  Right?  Hunches are important.  You're like, I

15   think that this guy's dirty.  Whatever.  Continue on with this

16   investigation however fit.  You get to the end and make an

17   arrest for a serious crime.  Good.  Right?  I get it.

18          But a search warrant was improper here because this

19   search warrant was based on a hunch.  This search warrant was

20   based on images that he looked at and he thought, These are

21   weird.  And his testimony was that he thinks that Thilges

22   might have progressed to that.  But that's just speculation.

23   That's a guess.  It doesn't matter whether that guess was

24   right or wrong.  That's a guess.  It's not based on any

25   evidence.

1          So that's the reason, Your Honor, that I think that

2   the search warrant 2 is -- was not based on probable cause.

3          **THE COURT:**  If you're right on search warrant 2 and

4   there wasn't probable cause, would you have a problem with a

5   good-faith exception on the second search warrant?

6          **MR. SCHWARTZ:**  Well, I have a problem with the

7   good-faith exception, generally.  But --

8          **THE COURT:**  Most defense attorneys do.  I

9   understand.

10          **MR. SCHWARTZ:**  I would because I think that that

11  wouldn't be good faith here because the agents could have

12  conducted further investigation, which he admitted he did not.

13  Did you speak to the kid?  Did you speak to who we thought to

14  be the mother?  Right?  These things could have been done.

15          Another search warrant for the house could have been

16  conducted, assuming this was after the date -- yeah, whatever.

17  Another search warrant for the house could have been done to

18  go look for specific evidence.  What kind of evidence might

19  there have been?  More disgusting things, perhaps, could have

20  been found.  Maybe -- maybe -- you know, we talk about

21  attempted -- attempted production and maybe we see things like

22  lubricant and other sorts of things that might lend themselves

23  to this actual act.  Right?

24          But they could have done more but they chose not to.

25  So can they just rely on good faith and say, Well, this is

1    what we got.  You know, we've got this guy sitting here on all

2    these threats.  Let's go get a warrant.  I don't think they

3    can.  So to answer your question, without jesting, I don't

4    think the good-faith exception would allow this to be

5    admissible either.

6            **THE COURT:**  I'm going to ask you a question about

7    your motion to dismiss on the *Bruen* principle.

8            **MR. SCHWARTZ:**  So the *Bruen* argument, Your Honor,

9    that, obviously, is to strike Count 3 which is the possession

10   of the suppressor.  That's a detailed legal argument that I

11   don't see any need to orally supplement here in court.  I'd

12   like to just rest on that motion, Your Honor.

13           **THE COURT:**  All right.  And just, my only question

14   is whether you think *Bruen* limits the decision in *Heller* or

15   does it expand the decision in *Heller*?

16           **MR. SCHWARTZ:**  Kind of the 64,000-dollar question.

17   I don't know the answer to that.

18           **THE COURT:**  Well, I ask it because it seems to me

19   that *Heller* says that dangerous and unusual weapons are not

20   protected by the Second Amendment and there's a body of case

21   law saying silencers are dangerous and unusual weapons.

22           **MR. SCHWARTZ:**  *Bruen*, obviously, to some degree, and

23   that's debatable, turned everything on its head, and we're

24   just going to have to wait and see where that all shakes out

25   upstairs.  Or not -- well, upstairs and across the country.  I

1    don't know the answer.

2             **THE COURT:**  You can wait, but I've got to figure it

3    out.  So...

4             **MR. SCHWARTZ:**  You've got to figure -- right.

5             **THE COURT:**  All right.

6             **MR. SCHWARTZ:**  I mean, I understand what the -- what

7    the law is now and, quite frankly, and I think Mr. Thilges

8    knows this, we don't expect you to sustain my motion to

9    dismiss Count 3, but we're preserving the record.

10            **THE COURT:**  Understood.  All right.  And I'll allow

11   you to rest on your --

12            **MR. SCHWARTZ:**  Thank you.

13            **THE COURT:**  -- written motion.

14            **MR. SCHWARTZ:**  Thank you.

15            **THE COURT:**  Anything further, Mr. Schwartz?

16            **MR. SCHWARTZ:**  Nothing.  Thank you for your

17   patience.

18            **THE COURT:**  And on behalf of the United States?

19            **MS. LANG:**  Thank you, Your Honor.  As to the

20   defense's first motion to suppress, the first search warrant,

21   the crux of that was in their motion whether or not those

22   threats by the defendant were true threats and the Government

23   believes they are.

24            And the test that's laid out for that is -- was

25   first in *Virginia v. Black*.  And it stated that statements

1   that communicate a serious expression of an intent to commit

2   an act of violence, either to a group or an individual, are a

3   threat.  And the speaker does not need to have an intent to

4   actually carry out the threat.  Under 875(c), the threat

5   itself is the crime.

6            And in this case, there were 50 threats posted

7   online by the defendant that can be attributed to him.  Some

8   were to groups.  Some were to individuals.  Some were to both.

9   But -- and the defense talks about how these were just

10  political rants, but they went way further than political

11  rants.  They became jest threats to commit murder and

12  violence.

13           And they were posted, a lot of the threats,

14  especially the ones at the beginning, were against YouTube

15  employees, just to kill them.  Straight out, "People need to

16  kill.  I want to kill YouTube employees."  They were posted on

17  YouTube's platform and YouTube was fearful enough that they

18  contacted the FBI and continued to contact the FBI throughout

19  the course of the investigation forwarding the threats to the

20  FBI so they could investigate them.  And they went so far as

21  to suspend his accounts so that he had to create three

22  separate e-mail addresses because the first two had been

23  banned from the platforms because of the threats that he was

24  posting.

25           So he knew his message was getting across because he

1    had to make a new e-mail address to get back onto the platform

2    because his earlier threats had been so violent against both

3    the groups and individuals that work for those social media

4    companies.

5              **THE COURT:**  But do you agree with Mr. Schwartz that

6    the Court has to balance the rights of the individual to

7    engage in political speech under the First Amendment when it's

8    know it's making its decision on whether or not there's

9    probable cause to support a search warrant under the Fourth

10   Amendment?

11             **MS. LANG:**  Yes, Your Honor.  In *Bellrichard*, the

12   Court talked about in that case how political venting is

13   covered by the First Amendment.  Saying democrats are morons,

14   saying the government's doing a horrible job.  All of that is

15   protected by the First Amendment.  But political venting can

16   turn into a true threat and become an 875(c) violation when it

17   moves past just plain political debate and venting and into

18   the realm of causing fear and violence against a group of

19   individuals or an individual.

20             And the Eighth Circuit just recently came down with

21   an opinion in *Dierks*, which is D-I-E-R-K-S, in which someone

22   was threatening online a senator in Iowa.  And while the

23   threats were political in one type of nature, the Court upheld

24   them as true threats because they were threats of violence

25   against that senator.  So while they were political, they were

 1   still considered a crime.

 2            And as I said in this case, he -- the -- and in

 3   *Stevens*, also, it doesn't matter whether or not it was

 4   plausible that he could carry out the threats, as long as the

 5   recipients received them and they were threats of violence, it

 6   didn't matter.  Like in *Stevens*, the defendant was in

 7   Connecticut.  He was threatening the entire Tulsa Police

 8   Department.  Tulsa Police Department didn't know he didn't

 9   have the whereabouts to come down from Connecticut.  The

10   conviction on the true threats was upheld.

11            **THE COURT:**  Does it matter in this case that the

12   threats against the specific individuals were the CEOs of

13   Twitter or CEO of YouTube or some politician in another state?

14            **MS. LANG:**  No.

15            **THE COURT:**  Would that be pretty close to

16   complaining about, you know, that the president was a bum or

17   something to that effect?

18            **MS. LANG:**  No.  Similar in *Dierks*, that was a

19   United States senator that was being threatened.  You might

20   think that maybe the threats were still considered a crime of

21   violence, even though that defendant maybe was -- did not have

22   the means of actually going to Washington, D.C. and beating

23   her up in person.  The Court said the threats alone, even to

24   an individual like a CEO that might be hard to get to, they

25   were still threats and crimes of violence.

1          As far as the *Franks* issue that they brought up,

2     there was no testimony that the law enforcement intentionally

3     left out threats or recklessly was trying to mislead the

4     Court.  And if those threats were admitted to the search

5     warrant, they would actually supplement the probable cause,

6     they would not diminish the probable cause in this case.

7          **THE COURT:**  Well, on that issue, I think it would be

8     fair for the Court to assume that the agent had access to all

9     of the data.  I assume Mr. Schwartz is citing things that were

10    produced by the Government that the Government had obtained

11    and the agent would have intentionally left some of those

12    things out of the affidavit.  Wouldn't that be a fair

13    assumption to make?

14          **MS. LANG:**  Yes.  The agent had more threats than

15    were put in the probable cause statement.  16 were put in out

16    of the 50 and that was just -- that was not to intentionally

17    mislead.  And he wrote in the affidavit, "There is more

18    threats of the same nature, same type, but that were left out,

19    you know, for brevity."  These were the 16 most recently, I

20    believe, were the ones that were left in.  But, again, if we'd

21    supplement the other 34 or so threats, it would not take away

22    from the probable cause in this case which is the standard

23    under *Franks*.

24          **THE COURT:**  Well, I think that's the harder question

25    for Mr. Schwartz is if we added in all of the -- all of the

1  threats, would it -- would it diminish the probable cause?  He

2  believes the answer is yes, that it would show that these are

3  just political rants or things that he knew he could not do

4  and would not do, but made it feel better to get it off his

5  chest to say them over the internet.

6        **MS. LANG:**  Well, I believe we went through some of

7  those in the testimony today and Mr. Schwartz was unable to

8  prove through any of the -- and he has all the threats, which

9  one would have diminished the probable cause.  The ones that

10  he went through, that he wants millions and million of

11  democrats dead, that he wants to go to Portland and kill

12  people himself.  Those are, I believe, the ones that he put --

13  there was one about Trump and, again, there was more violence

14  in that one.  None of -- none of the threats would have

15  diminished the probable cause and Mr. Schwartz hasn't been

16  able to show that.

17        **THE COURT:**  Well, in his pleading, he said there's

18  one where he said, "I want a million dollars but that isn't

19  going to happen."  Just say, like, "I want all these people

20  that I don't like to die and go away, but I also want a

21  million dollars.  That isn't going to happen."  So does that

22  indicate that he's not actually threatening someone, that he's

23  just engaging in a political rant?

24        **MS. LANG:**  Well, the beginning of that thread, he

25  says, "I want millions and millions of democrats dead.  I want

1    to swim in their blood.  I want to feed them to my dog."  But,

2    again, "I want to win the lottery also but that's not going to

3    happen."  I mean, the way I -- I guess you'd take it is that

4    he realizes he can't kill millions and millions of people.

5    It's just utterly impossible for one person to do that.  So --

6    but he still wants it done.  So that's how I took it.

7              So I would, again, think, even conditional threats

8    under, like, *Mabie*, some of those -- in that case, M-A-B-I-E,

9    that some of those were unconditional; however, those were

10   still found to be true threats.  Even when someone says, "I

11   might do this" or "I want to do this," those types of threats

12   have also been determined to be true threats even though there

13   was a conditional aspect to it by the speaker.  So I don't

14   think him putting, "I want a million dollars too" diminishes

15   from the threat itself.

16             **THE COURT:**  All right.  Can I ask you a question

17   about the motion to dismiss Count 3?

18             **MS. LANG:**  Sure.

19             **THE COURT:**  So the Supreme Court says that the

20   Government is supposed to prove to me the history of how

21   things happened back in 1791.  So how were silencers handled

22   in 1791?  What were the laws relative to silencers?

23             **MS. LANG:**  Well, again, I put this forth in my

24   brief, too, but there was no silencers back in 1791, so I

25   don't believe silencers fall under the *Bruen* -- the case law

1    following that.  First of all, they're not arms under the

2    definition of an arm back in Antebellum America, and even

3    today, because, alone, a silencer is not a firearm.  It has to

4    be attached to a firearm to do anything.  It's -- again, under

5    *Bruen*, they're trying to -- *Bruen* is trying to protect an

6    individual's right to carry a firearm, mostly, in self-defense

7    cases, in protection of the home.  That's not what we have in

8    this case with a silencer.  It does not protect you from

9    anything.  It would not protect your home from anything.  It's

10   mostly just to muffle the sound that comes out of a firearm.

11           So in 1791, they didn't have serial numbers and they

12   did not have silencers.  So it's hard to go back and figure

13   out how a silencer would fit into *Bruen*.  But as I said, under

14   *Heller*, they are categorized as a dangerous and unusual

15   weapon, and, therefore, can be limited and your rights can

16   be -- and can be regulated to a reasonable degree.

17           **THE COURT:**  All right.  Anything further you'd like

18   to argue today?

19           **MS. LANG:**  Just shortly, Your Honor, on the child

20   pornography warrant.

21           When it comes to that one, it wasn't just one

22   picture of the child with her pants pulled down and in an

23   unnatural pose.  It wasn't just two pictures of the child with

24   her pants pulled down in a very unnatural pose.  It was at

25   least three separate times there were pictures that the agents

1   were coming across as they were searching his phone for

2   evidence of the threats of this child in his apartment -- or

3   in his home, on his couch, sleeping, and there were numerous

4   other pictures of the child just sleeping and the focal point

5   in these pictures are her genital area and it was an attempt

6   to capture the genital area and it was an attempt to produce

7   child pornography.

8           And the agents had a warrant to search all of the

9   electronic devices.  And they kept searching all the

10  electronic devices.  When they came across these images of the

11  girl, out of an abundance of caution, they went and got a

12  second warrant in case they came across more child

13  pornography, which they did.  And they would have had to

14  search the computers and did search the computers, even if

15  they hadn't gotten a second warrant and would have come across

16  the 7,000 images of internet child pornography.

17          **THE COURT:**  Did the original search warrant give

18  them permission to search for 7,000 images of child

19  pornography?

20          **MS. LANG:**  No.  No.  It gave them permission to

21  search all the electronic devices for threats, but in the

22  process of doing that, they would have come across -- had they

23  started with the computer rather than the cell phone, they

24  would have come across the internet child pornography before

25  the pictures of the girls.

1              And then good faith.  I don't believe there's been

2    any indication during -- Mr. Schwartz had plenty of time to

3    cross-exam both affiants in this case and there was no

4    indication that there was any good faith when it came to

5    drafting the search warrants.

6              **THE COURT:**  All right.  Thank you very much,

7    Ms. Lang.

8              Anything further, Mr. Schwartz?

9              **MR. SCHWARTZ:**  No, Your Honor.

10             **THE COURT:**  All right.  I have received what appears

11   to be a stack of exhibits.

12             **MS. LANG:**  Your Honor, do you want the 6a through

13   6e?  I only made one copy of those so they wouldn't be

14   floating around.

15             **THE COURT:**  Can I have 6e?  I don't want 6a through

16   d.

17             **MS. LANG:**  Okay.

18             **THE COURT:**  But I -- 6e is the photograph of the

19   child with the gun?

20             **MS. LANG:**  Yep.

21             **THE COURT:**  I will take that.  So I've received 1,

22   2, 3, 4 and 5.  I have 6e, 7a, 8, and 9a through e.  Is that

23   everything?

24             **MS. LANG:**  And 7 had a b and a c.

25             **THE COURT:**  You're correct.  I have 7a, b, and c.

*Evidentiary Hearing*                                                    141

1            **MS. LANG:**  Yep.  Correct.

2            **THE COURT:**  Okay.  And I will leave Government's

3    Exhibit 6a and 6d in the possession of the United States.

4            **MS. LANG:**  Thank you, Your Honor.

5            **THE COURT:**  All right.  Anything further,

6    Mr. Schwartz?

7            **MR. SCHWARTZ:**  No, Your Honor.

8            **THE COURT:**  All right.  I'm going to remand you to

9    the custody of the United States Marshals Service,

10   Mr. Thilges, and I know you've been in jail a long time.  I'll

11   try and get you an answer on these motions as quickly as

12   possible.  All right?  So stay in touch with your attorney.

13           Court will be in recess.

14           **(The proceedings concluded at 12:45 p.m.)**

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>


    I, Carla M. Klaustermeier, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

    I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

    I further certify that this transcript contains pages 1 through 141 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

    Dated at St. Louis, Missouri, this 17th day of May, 2023.



           /s/ Carla M. Klaustermeier
           Carla M. Klaustermeier, RMR, CCR, CSR, CRR
           Official Court Reporter